**HART** and **HOYT,** *appellants,* and **THE MAYOR, ALDERMEN AND COMMONALTY OF ALBANY,** *respondents.*

It is not lawful for an individual, *without grant,* to construct and moor a *floating store house* or vessel for the receiving and delivering out of goods and merchandize in any public river, or in any port or harbor, or in the basins or docks thereof; such permanent appropriation and exclusive occupation of a portion of a public river, &c. is an obstruction to its free and common use and is indictable as a *public nuisance.*

A *corporation,* whose duty it is to prevent obstructions in a river, will be considered a *party aggrieved,* and may by its own act, without indictment, abate or remove such nuisance.

Whether an *individual,* without being specially aggrieved, has a right to abate or remove such nuisance, *quere.*

In summary proceedings for the abatement or removal of nuisances, the party whose interests are effected thereby is not entitled to a jury.

The corporation of Albany have the right to pass ordinances to prevent obstructions in the docks and slips within its bounds, and in the river opposite to such docks, wharves and slips, and to enforce the same by the infliction of a penalty not exceeding $25 for each offence; but they cannot pass a *by-law,* subjecting a vessel lying in any basin, dock, &c. to *seizure and sale,* in case of refusal by the owner after notice to remove the same; the right to make a by-law creating a *forfeiture* not being given, and the remedy of enforcing their by-laws having been specified.

The act of 1823, authorizing the construction of a basin in the Hudson river opposite the city of Albany, does not affect the *jurisdiction* of the *corporation* over the waters in the same, though for some purposes the basin is considered a part of the canal.

Where parties, complainants in chancery, had obtained an *injunction* restraining the corporation of Albany, their officers, agents and servants from intermeddling with a *floating store house* constructed by them and moored in the *Albany basin,* which the corporation had threatened to remove and destroy, which injunction was dissolved by the chancellor and the parties appealed; *it was held* by the court for the correction of errors, that the appellants had utterly failed in establishing a right to erect and continue their *floating store house* in the basin; that if the question of right was less clear against the complainants, they were not entitled to an injunction, because they could obtain ample compensation in an action at law, by way of dam-

ages, for any injury they might sustain from the threatened acts of the corporation ; that if the right of the complainants was doubtful, and the injury which they might sustain susceptible of adequate compensation at law, they were not entitled to an injunction simply on the ground that the threatened trespass would cause a total destruction of their property—that alone not being a sufficient ground for an injunction, and for these reasons, the order of the chancellor dissolving the injunction was *affirmed*.

APPEAL from chancery. The appellants filed a bill in chancery against the mayor, aldermen and commonalty of the city of Albany, stating in substance that they were merchants residing in the city of New-York, engaged in the transportation of goods and merchandize on the Hudson river from New-York to Albany by means of steam and tow boats, and in the conveyance of produce to market by the same channel and means of conveyance ; that for the purpose of carrying on their business advantageously, they rented two lots with stores on them, and two vacant lots adjoining, making in the whole 110 feet front *on the pier*, which forms what is called *the basin* in the city of Albany ; that to facilitate their business, they caused to be constructed and built, at an expense of more than $3000, a float or ark about 120 feet in length and about 42 feet in width, with a covering or roof and convenient openings at the sides for receiving and discharging bales, casks, and merchandize of every description, which they had moored on the inside of the basin near and opposite to the stores and lots occupied by them ; that the float or ark was moored in a part of the basin where sloops and other craft engaged in the navigation of the Hudson river, or canal boats, (with the exception of the tow boats used by the appellants and such of the canal boats as transact business with them,) *never came or had occasion to come* in the ordinary course of their business ; so that the float, in its then and intended location, did not nor would constitute any obstruction to the free passage or any business transaction of the sloops or other craft or vessels engaged in the commerce of the Hudson river or the canals ; that by the use of the float or ark, tow boats could be unladen with greater expedition than formerly, and canal boats could and did receive their cargoes thus discharged, upon an average, at least three days sooner than could otherwise be done. They further stated, that the mayor, al-

dermen, and commonalty of the city of Albany, with the view of preventing the appellants from the enjoyment of the use of the float or ark, and with the design of utterly destroying the appellants' property therein, did, in common council assembled, on or about the 25th July, 1831, in special reference to the float or ark of the appellants, pass an ordinance or law by which the dock master of the city of Albany was required to fix a notice on any vessel, boat or float in the basin, not used in the navigation of the Hudson river or the canals, and the owner of which should not be a resident of said city, requiring its removal in ten days, and in case of its not being so removed, directing the dock master to remove and sell the same, or the materials of which it had been built, at public auction, and to pay the money arising from such sale, after deducting the expense of removal and sale to the chamberlain of the city for the use of the mayor, aldermen and commonalty thereof, and on the eighth day of August, in the same year, another ordinance, amendatory of the former and of a similar character, was issued by the said common council; that in obedience to the directions of the mayor, &c. the dock master on or about the 11th day of August, affixed upon the float or ark of the appellants a notice requiring the same to be removed from the basin and from the wharves of the city of Albany on or before the 22d day of August then instant ; and further, that on the omission of the appellants to remove the float or ark, he would take possession of and remove the same. The appellants charged that, inasmuch as the float or ark could not be removed from the basin without being taken into pieces and destroyed, except during the period of a very high freshet in the river, and that fact well known to the common council, it was the intention of the common council wholly to destroy the float or ark, to the irreparable injury of the appellants, and to the great and useless detriment of their business. They further charged that the several ordinances, laws and directions of the common council of Albany were illegal and unwarranted by any constitutional power or authority ; that the common council had no jurisdiction over the pier lots rented and occupied by the appellants, or over that part of the basin where the float or ark was used, except for the purpose of

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c of
Albany.

abating, removing or preventing public nuisances, and preserving the public health and peace ; that the basin was declared to be a part of the canal, and the jurisdiction thereof, for all the purposes of navigation and the regulation of boats, vessels and other craft, is vested in the state of New-York and its officers. The bill further charged that the float or ark did not interrupt or impede any other vessels or craft in its free passage to, over or from the basin, or divert or interrupt any commercial business whatever, and that yet the common council of Albany threatened and intended to remove and destroy the float or ark of the appellants ; wherefore they prayed an injunction and such further relief as might be agreeable to equity. On the filing of this bill, an *injunction* was granted by the vice chancellor of the third circuit, restraining the mayor, aldermen and commonalty of Albany, their officers, servants and agents, from intermeddling with the float or ark of the appellants.

The defendants put in an answer, in which they allege, that for the purpose of effectually guarding the canal navigation of the city of Albany, the legislature of the state did, on the 5th April, 1823, pass a law authorizing the construction of a *mole* or *pier* in the Hudson river opposite the city of Albany; and pursuant to the provisions of such act, and the acts amendatory thereof, the pier or mole had been constructed at an expense of $120,000, the object of the construction being to afford a commodious basin for the safe riding of vessels navigating the canals or the Hudson river ; no dockage or wharfage, however, to be charged to any canal boats, but boats navigating the Hudson river, when moored in the basin, to pay double the usual rates of wharfage and dockage. They further allege that the appellants had intentionally made, constructed and used the float or ark mentioned in the bill to rid themselves of the expense of hiring other store houses, and also to free themselves of the expense of dockage and wharfage, they well knewing that under the act of 1823, neither dockage or wharfage could be collected from any vessel lying in the basin, unless used in the business of *navigating* the Hudson river. They deny that the float or ark is moored in a part of the basin where sloops and other water craft engag

ed in the navigation of the Hudson river, or canal boats (with the exception of the tow boats used by the appellants and such of the canal boats as transact business with them) never come or have occasion to come in the ordinary course of their business, as alleged by the appellants; and on the contrary, they charge that the mooring of the float or ark is an obstruction to the free navigation of the Albany basin; they deny that the float in its then location did not constitute an obstruction to the free passage or business transactions of the sloops or other craft, or vessels engaged in the commerce of the Hudson river or the canals, as alleged by the appellants, and aver that it never was the intention in the construction of the basin that the description of hulk built and used by the appellants should be accommodated within its waters. They admit that for the purpose of protecting the commercial interests of the city of Albany, they passed an ordinance on the 13th August, 1829, declaring that no vessel, craft, boat or flat shall remain at, or lie within any dock, wharf or slip within the city, for a longer time than shall be necessary for the convenient lading or unlading of the same, so as to prevent any other vessel, craft, boat or flat from coming to or in such dock, wharf or slip, and imposing a penalty of $2,50, for every tide, upon the master of every vessel preventing another vessel from coming to or going out of any dock, &c.; and by another section of the same ordinance they admit it is declared that no vessel, craft, boat or flat shall lie at or within any such dock, wharf, pier or slip, *except such as are actually employed in navigating the Hudson river*, under the penalty of $25; and that for the purpose of amending the last mentioned section, they, the said Mayor, Aldermen and Commonality of the city of Albany in Common Council convened, did on the 25th July, 1831, pass a law requiring the dock-master to give notice for the removal of any vessels, &c. not actually employed in navigating the Hudson river, lying within any basin, &c. and on neglect of the owners to remove the same, directing the dock-master to take possession of and cause the same to be removed, and at public auction to sell such vessels, &c. or the materials of which the same shall be built, and to pay over the proceeds, after

deducting expenses, to the chamberlain of the city, as is in substance set forth in the bill of the appellants—the ordinance, however, providing for the paying over to the owner of such vessel such proceeds, on satisfactory proof of ownership being exhibited.   They admit that on the eighth day of August, 1831, they passed an ordinance amendatory in some formal matters of the last mentioned law, but not materially varying it.   They deny that the ordinance of July, 1831, was passed with the design of destroying appellants' property in the float or ark, but admit that its object was to effect the removal of the same from the basin.   They admit that on the 13th June, 1831, a resolution was adopted and passed by them in common council convened, directing the dock-master to give notice to the appellants to remove the float or ark ; and in case of neglect or refusal to do so, after reasonable notice, that the proper measures provided by law be taken for the removal thereof, and the punishment of the offenders ; they admit that on the 11th August, 1831, a notice to remove the float or ark was given by the dock-master in obedience to the directions of the defendants ; they avow their intention to remove the float or ark from the basin, and admit that it will be necessary to break up or take the ark in pieces in order to remove it ; but they deny that it would be necessary to destroy it, or that such was their intention.   The answer concludes by claiming that the defendants have control and jurisdiction over the pier and the basin as parts of the city of Albany, and that by the charter of the city and by the laws of the state they have power and authority to pass such laws and ordinances as shall be necessary for the public good, for the protection of commerce, and for the best intetests of the city ; and although the *basin* may by law be declared a part of the *canal*, still they claim that for all the purposes of navigation, and for the regulation of boats, vessels and other craft in the basin, the jurisdiction is vested in them, the Mayor, Aldermen and Commonalty of the city of Albany.

On the coming in of the answer, the defendants below applied to the chancellor for a *dissolution of the injunction*, who made an order dissolving the same.   See the opinion of the

chancellor. 3 *Paige*, 213. From which order the com-
plainants below appealed to this court.

The cause here was argued by

*B. F. Butler & A. Van Vechten*, for the appellants; and by

*J. Lovett & J. M'Kown*, for the respondents.

The following opinions were delivered:

By Mr. Justice SUTHERLAND. The chancellor ordered
the injunction in this case to be dissolved, principally upon
the ground that the threatened interference of the defend-
ants with the complainants' property, if carried into effect,
would if illegal be a mere *trespass*, for which the complain-
ants would have an ample remedy at law, and that it was
not the course of the court in such cases to grant an injunc-
tion before the complainants' right was established at law,
unless it was free from all doubt, or unless, from the nature
of the case, the injury would be irreparable, or from the ir-
responsibility of the defendants, compensation by way of
damages could not be obtained; and he was of the opinion
that the right of the complainants to erect and continue the
float in question, in the manner set forth in the pleadings,
was at least doubtful, and if it should finally be established,
that it was an ordinary case for the assessment of damages
by a jury, and there was no allegation or pretence of the
irresponsibility of the defendants.

The general doctrine that a court of equity will not grant
an injunction, to restrain a *mere trespass*, where the injury is
not irreparable and destructive to the plaintiff's estate, but is
susceptible of pecuniary compensation, and for which the par-
ty may obtain adequate satisfaction in the ordinary course
of law, is believed to be perfectly established. The practice
of granting injunctions in any case of mere trespass is quite
modern in the English court of chancery. As late as 1786,
Lord Thurlow, in *Mogg* v. *Mogg*, 2 *Dickens*, 670, said that no
such case was to be found, and denied an injunction in that
case, although the act complained of was the cutting and de-

struction of timber, on the ground that the defendant was a mere trespasser, and as such liable to an action at law. Subsequently to that period, however, the practice has grown up and is now well established of restraining trespasses in special cases, where irreparable injury would otherwise follow ; thus in *Mitchell* v. *Dors*, 6 *Ves.* 147, Lord Eldon allowed an injunction against the defendant who had worked from his own coal mine into that of the plaintiff. Lord Eldon put himself upon the authority of a similar case said to have been decided by Lord Thurlow. This appears to have been the case of *Flamang*, and is stated at length by Lord Eldon in *Harson* v. *Gardner*, 7 *Ves.* 308. In *Courthorpe* v. *Mapplesden*, 10 *Ves.* 290, a trespasser was enjoined from cutting timber, it being alleged to be done in collusion with the tenant ; Lord Eldon remarked that the trespass partook of the nature of waste, there being collusion with the tenant, and he put the decision upon that ground, expressly reserving himself upon the case of a mere trespass, though he refers to the cases of *Mitchell* v. *Dors*, and *Harson* v. *Gardner*. In *Earl Cowper* v. *Barker*, 17 *Vesey*, 128, the trespass was in the nature of waste. The bill was filed by the lord of a manor and his lessees, to restrain the defendant from taking certain stones of a peculiar character and value, found at the bottom of the sea within the manor. It was put upon the ground of the irreparable nature of the injury. In *Thomas* v. *Oakley*, 18 *Ves.* 184, the defendant was restrained from taking stone from the plaintiff's quarry. Lord Eldon goes somewhat at length into the doctrine, and refers to the cases of injunctions to restrain the cutting of timber, digging of coal and other mines, and says that the court interferes in such cases to prevent the removal and destruction of that which is the plaintiff's estate and freehold ; and he held the principle equally applicable to a stone quarry. So in *Robinson* v. *Lord Byron* 1 *Bro. C. C.* 583, an injunction was granted against diverting a water course from a mill, on the ground that it was absolute destruction to the mill. *Vide* also *Crockford* v. *Alexander*, 15 *Ves.* 138. In all these cases there was no dispute about the plaintiff's title ; that was a conceded point in all of them. But in *Pillsworth* v. *Hopton*, 6 *Ves.* 51, an injunction to restrain waste was denied, the de-

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c. of
Albany.

fendant being in possession and claiming by an adverse title ; and in *Smith* v. *Collyer*, 8 *Ves.* 89, it was refused where the title was disputed as between devisee and heir at law.

This doctrine was several times under the consideration of Chancellor Kent. In *Stevens* v. *Beekman and others*, 1 *Johns. Ch. R.* 318, he refused an injunction to restrain the defendants from cutting timber from land of which the plaintiff was in possession as owner, although it was alleged that the premises were principally, if not exclusively valuable on account of the timber. He adverted to the doubts and difficulties of Lord Thurlow and Lord Eldon as to injunctions for trespass, and expressed his own conviction that the public convenience would not be promoted by the exercise of such jurisdiction, except in cases of a very peculiar nature, where irreparable injury would otherwise arise. In *Livingston* v. *Livingston*, 6 *Johns. Ch. R.* 497, the defendant and his tenant claimed a right to *estovers* in the land of the plaintiff; there had been an action at law tried and decided in favor of the plaintiff, and another suit was pending on the same question. In this stage of the case, the plaintiff applied for an injunction to restrain the defendant and his tenants from cutting any more timber; the injunction was granted on the ground of preventing multiplicity of suits. The right having been decided in favor of the plaintiff in one action, and another suit at law being still pending, the chancellor held it just and necessary that the further disturbance of the *freehold* should be prevented until the right was finally settled. The chancellor referred to the English cases, in which injunctions to restrain trespasses had been granted, and said the principle of the jurisdiction in all of them was to *preserve the estate from destruction ;* he also referred to the then recent case of *Garstin* v. *Asplin*, 1 *Madd. Ch. R.* 150, as showing that the general rule in England was, that an injunction will not lie in a naked case of trespass, where there is no privity of title, and where there is a legal remedy for the intrusion ; that there must be something peculiar in the case so as to bring the injury under the head of quieting possessions, or to make out a case of irreparable mischief or of jeopardy *to the inheritance.* This doctrine was again considered and elaborately discussed by Chancellor

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c. of
Albany.

Kent, in *Jerome and others* v. *Ross,* 7 *Johns. C. R.* 315, where he dissolved an injunction which had been granted by one of the vice-chancellors restraining the defendants from taking and carrying away stone *from a ledge or mass of rock* belonging to the plaintiff, for the purpose of being used in the construction of a dam connected with the Champlain canal. He again referred to the English cases, and again remarked that they were all cases of great and irremediable mischief which damages could not compensate, because the mischief reached to the very substance and value of the estate, and went to the destruction of it in the character in which it was enjoyed. The case before him he held distinguishable from those, by the fact that the plaintiff did not aver or shew that the mass of rock on which the trespass was committed was of any essential use or value ; and he remarked that if the plaintiff was entitled to an injunction in that case, he did not see why every man in the possession of land might not call for an injunction to protect him from his neighbours's trespasses in every possible case ; that he thought it inexpedient upon every principle of justice and policy to substitute the chancery remedy of injunction for the more gentle common law remedy by action and the assessment of damages by a jury, except in very strong, peculiar and aggravated instances of trespass, where the injury could not well admit of recompense. He referred to several cases in which incorporated companies and other public bodies had been restrained by injunction in cases of trespass, but they were all cases in which they clearly exceeded their powers, and were making permanent *appropriations of the land, and were destroying the inheritance of the complainants. Agar* v. *The Regent's Canal Co., Coop. Eq. R.* 77. *Shand* v. *Henderson,* 2 *Dow.* 519. *Hughes* v. *The Trustees of Merton College,* 1 *Ves.* 188. In this last case, Lord Hardwicke granted an injunction against the commissioners of a turnpike company, who forcibly entered the complainant's garden, dug up his roots, &c. and took from it gravel for their road. Although a very aggravated case, Lord Hardwicke said that if there had been any ground of doubt as to the authority of the commissioners, he would not have interposed until that doubt was removed, and finally determined at law ;

but none such existing, the nature of the injury was such as to entitle the complainant to an injunction. *Vide* also 2 *Johns. Ch. R.* 162, 463. The principle of interfering by injunction to prevent multiplicity of suits, is applicable only to cases where the right is controverted by numerous persons, each standing on his own ground, and not to the case of one or more persons persevering in repeated acts of trespass, notwithstanding suits and recoveries against them. *Lord Tenham* v. *Herbert*, 2 *Atk.* 483. *Eldridge* v. *Hill & Murray*, 2 *Johns. Ch. R.* 281. In *Livingston* v. *Van Ingen*, 9 *Johns. R.* 507, the defendants were restrained from navigating the Hudson river with boats propelled by steam, in violation of an exclusive right conferred upon the complainants by a long continued series of legislative acts. The right of the complainant was held to be clear, and the injury not easily susceptible of compensation by way of damages.

To entitle the complainants in this case, therefore, to an injunction, upon the principles established and recognized in the cases above referred to, it was incumbent upon them to establish at least a strong *prima facie* right to erect and continue their float in the basin in the manner and for the purpose stated in the pleadings; and to show that if it should be removed or destroyed, the injury would be irremediable and incapable of compensation by way of damages. The burthen of establishing the right rests upon the complainants. They invoke the extraordinary interposition of a court of equity to protect their property against a trespasser, and must bring themselves within the established principles upon which alone a court of equity will interpose in such cases. They appear to me to have utterly failed in establishing their right; in the first place, there is no presumption in its favor arising from long continued and unmolested exercise and enjoyment. They were warned by a formal notice from the corporation before their machine was completed that its erection was considered illegal. It was erected in direct violation of an ordinance of the corporation of the city of Albany. The complainants neither show nor claim any exclusive or peculiar right to erect and use a float of this description within the basin. It is conceded that the proprietors of any other line of tow boats, or

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c. of
Albany.

any individual or association of individuals engaged in the shipping and transporting of merchandize, would have the same right to erect a similar machine, and that it would be equally convenient and advantageous to them. It is admitted that if this right should be generally exercised, and any considerable number of these floats should be permanently moored within the basin, it would destroy the main purpose for which it was created, and instead of promoting the public convenience, they would then become a public nuisance. The object of the construction of the basin was to afford a safe harbor for canal boats and vessels navigating the river, while engaged in transhipping produce and merchandize, the one from the other, or in unlading and taking in their cargoes in any other manner. All the provisions of the act show that the common, free and uninterrupted use of every part of the basin was intended to be secured to all the canal boats and vessels that might enter it; and a right permanently and exclusive to occupy any portion of its waters by any individual or association of individuals, is utterly inconsistent with the purpose for which it was created, whether it be considered a mere basin or dock, or a public highway. If the complainants can moor a *floating store house* in the basin, it is not perceived why they may not erect a more permanent building, with its foundation on the bottom of the basin. It is very immaterial to the public how far either below or above the surface of the water the obstruction reaches; it impedes the navigation, or other use of the basin, neither more nor less on that account; and a row of brick or wooden store houses, extending from one extremity to the other of the basin, in front either of the pier or of the city docks, at a convenient distance from them, with occasional intervals for the purpose of access to them, may be erected and maintained, for aught I perceive, upon the same principles on which the right to erect the float in question is maintained. It may very well be that the convenience of the public at large would be promoted by it; that additional facilities for the transhipping of goods would be afforded; and that enough of the basin would still be left for the accommodation of the sloops and boats that might enter it. And yet, conceding all this, would any man contend that such erec-

tions could be justified ? It seems to have been supposed by the complainants in their bill, and also by their counsel, that the circumstance of their being the owners or lessees of the pier lots opposite to which their float is moored, gave them a right, in relation to that part of the basin, which otherwise they might not have possessed. I see no foundation for this opinion. The act authorizing the construction of the basin, *Laws of* 1823, *page* 128, made it the duty of the commissioners of the land office to grant, by letters patent to the commissioners appointed by that act, the land under water, occupied by said mole or pier, as soon as it should be completed ; and the commissioners were to divide it into lots, and sell those lots at auction. The purchasers, as proprietors of the pier, acquired certain rights in relation to canal tolls and wharfage and dockage, but they have no right to appropriate or use the waters of the basin, or the land under those waters in any manner which other citizens have not. Whatever may have been the intention of the complainants, it is obvious that their claim, if sustained, may affect most injuriously the proprietors of the city docks and of the pier ; that although there may be some conveniences for the purpose of loading and unloading vessels in a floating store house, which rises and falls with the tide, and which may be approached by boats on all sides at the same time, over a store house of the same description upon land, yet the most material advantange is the saving to the proprietors the expense either by way of rent or purchase, which they would have to incur, in order to obtain as large an area upon the pier or dock. The store house of the complainants, of the dimensions of 120 by 42 feet, costs them about $200 per annum, that being the interest of the sum expended in building it, accommodations to the same extent on the lower floor of a store or stores on the pier would probably cost at least five times as much. It pays no dockage or wharfage, because it is not a vessel which navigates the Hudson river ; and I presume no tax is imposed upon it, either as real or personal estate. If advantages of this character, and to this extent, can be legitimately obtained and enjoyed, there will be little demand for store houses or lots, as long as there is a va-

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c. of
Albany.

cant spot left in the basin where a floating store house can be moored.

If the basin be considered merely as a part of the Hudson river, (a great public highway,) the right of the appellants permanently to appropriate any portion of it to their own exclusive use is equally unfounded. They, like all other citizens, can use it only as an highway for the purposes of navigation ; they have no right exclusively to occupy any part of it, by either floating or permanent buildings or obstructions. This float, if permanently moored and continued in the open part of the river, thereby rendering the navigation less safe and convenient, would, I apprehend, most clearly be a public nuisance, liable to be indicted as such, or to be abated without indictment by any individual who might be injured or aggrieved by it. It certainly is not less a nuisance, if the views which I have expressed are correct, for being placed within the basin. The cases of *The King* v. *Russell*, 6 *East*, 427, *The King* v. *Cross*, 3 *Campb.* 224, and *The King* v. *Jones*, 3 *Campb.* 229, all show that any obstruction of a public street or highway for an unreasonable length of time, although in the prosecution of a lawful business, as in the loading or unloading of waggons or drays, or by stages waiting and soliciting for passengers, is indictable as a public nuisance, although room enough might still be left for the accommodation of the public on the opposite side of the street. The public are entitled to the use and enjoyment of the whole of the highway, and no individual can appropriate a portion of it to his own exclusive use, and shield himself from responsibility to the public by saying that enough is still left for the accommodation of others. In every point of view in which I have been able to consider this case, it appears to me that the right claimed by the complainants is not merely doubtful, but that it is most clearly and obviously unfounded ; and that upon this ground, without considering any other branch of the case, the decree of the chancellor dissolving the injunction was correct and might be affirmed.

But if the question of right was less clear against the complainants, I should still be of opinion that they were not entitled to an injunction on the ground that they could obtain

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c. of
Albany.

ample compensation in an action at law, by way of damages, for any injury which they might sustain from the trespass of the defendants. There would be no more difficulty in the assessment of damages by a jury in this case than in innumerable others which are daily occurring in our courts of law. The cost of the machine is easily proved, and its value to the complainants in the saving of time and labor in the transhipping of cargoes and the lading and unlading of boats and vessels, (if that be a legitimate item of damages,) can be established by witnesses who have seen its operation and know the nature and extent of the business in which the complainants employ it. Professional men, and others who are in the habit of attending our courts of law, well know that questions of a similar character in relation to the extent of damages, and of at least equal difficulty, are constantly presented to juries and by them settled and adjusted according to the weight of evidence in the case. If the complainants' right is doubtful, and the injury which they may sustain from the threatened trespass is susceptible of adequate compensation at law, they are not entitled to an injunction simply on the ground that the trespass will cause the total destruction of their float, as it cannot be removed from the basin without being broken up. The cases already referred to show that that alone is not a sufficient ground for an injunction. Admitting, therefore, that the corporation of Albany have no jurisdiction over the basin, that the ordinances complained of are unconstitutional and illegal, I am still of the opinion that the complainants have failed to show a case in which, according to the established principles of a court of equity, they are entitled to an injunction. It is unnecessary for me, therefore, to go at length into the consideration of the validity of those ordinances.

By its original charter, the city of Albany was bounded on the east by the Hudson river, at low water mark; but by an act passed the 25th March, 1808, 5 vol. of *Webst. ed. of the Laws*, p. 288, the easterly bounds of the city were extended to the west bounds of the county of Rensselaer, opposite to said city; that is, to the centre of the river. Previously, however, to this extension of the eastern line of the city, (to wit, in 1801,

2 *R. L. of* 1801, *p.* 157, *sec.* 19,) the corporation had been empowered to make by-laws to prevent the docks and slips and *the river opposite thereto from being in any manner obstructed.* Since 1808, therefore, the corporation have possessed and exercised the same general jurisdiction over the waters of the river, to the middle of the main channel, that they have a right to exercise over any other part of the city. It is not pretended that this jurisdiction has been taken away or limited by any subsequent act, unless it be by the act authorizing the construction of the basin. *Laws of* 1823, *p.* 128. To the passing of that act, the corporation assented. It appears from the preamble that it was deemed an act of great importance to the commercial interests of the city. So far, therefore, as that act limits or affects the rights and powers of the corporation, it is binding upon them. In some respects it does limit their powers and affect their previous rights. It expressly provides that no wharfage or other charge shall ever be exacted from canal boats or other craft, or rafts of lumber entering from the canal, and using the waters of the basin, or passing through the same into or from the Hudson river, or for laying along side the pier or bridges. *Sec.* 5. It fixes the sum to be charged for wharfage on all other vessels, and gives half of it to the proprietors of the pier. *Sec.* 6, 7 & 8. It makes it the duty of the canal commissioners to compute and charge tolls on all boats, &c. entering the basin from the canal, or leaving the basin for transportation on the canal, in the same manner as if the basin were a part of the canal; that is, they are to add the length of the basin in their computation of the distance for which toll is to be paid, and the increase of toll thus received, after deducting certain charges and expenses, is to be paid over to the proprietors of the pier. *Sec.* 9. It is to be considered as a part of the canal, for the purpose of ascertaining and collecting with convenience the amount of tolls to be paid by canal boats entering the basin. But in the tolls thus accruing and collected, the state has no interest; they belong exclusively to the pier company, and are paid over to them. The basin is in no sense, affecting the question of jurisdiction over its waters, a part of the canal. No jurisdiction or control over it is either expressly or impliedly given to the canal

commissioners; nor are the pre-existing powers of the corporation of Albany, in that respect, in any manner limited or restricted, except in the particulars already adverted to. In 1826, *Laws of* 1826, *p.* 184, the several acts relating to the city of Albany were amended and combined into one act. By the 15th section of that act, the common council are authorized, among other things, to establish and regulate docks, wharves, or whatever may be necessary in and about the same, to prevent the incumbering of the streets, side walks, wharves or slips with wheel-barrows, lumber, stone or any materials whatever; to regulate and restrain the running at large of horses, hogs, &c. and generally to make all such rules, by-laws and regulations for the good order and government of the said city and the commerce and trade thereof, as they may deem expedient, not repugnant to the constitution and laws of this state; and to inflict penalties for the violation of any by-law, not exceeding $25 for any one offence. The provision of the act of 1801, which empowered the corporation to make by-laws to prevent the docks and slips and the river opposite thereto from being in any manner obstructed. is almost in the same terms introduced into the act of 1826.

The question then is whether, under these various acts, the corporation of Albany had authority to pass the ordinance of July, 25, 1831, of which the appellants complain. That ordinance made it the duty of the dock-master, in case any vessel, craft, boat, &c. not actually employed in navigating the Hudson river or some one of the canals, should be within any basin, dock, wharf, pier or slip in said city, to cause notice to be given to the owner or owners thereof, to remove the same from the basin and wharves of said city within ten days after service of such notice; and if the same was not removed within that time, then it was made the duty of the dock-master to take possession of and remove it himself. In discussing this question, I shall assume, as having been already established, 1. That the corporation have authority to make by-laws to prevent the docks and slips of the city and the river opposite thereto from being in any manner obstructed, and to enforce the same by penalties not exceeding $25 for any one offence. 2. That the float of the appellants is an illegal and

unauthorized obstruction of the basin, considered either as a dock or a part of the river, and that an ordinance of the corporation directing the same to be removed under the penalty aforesaid would have been valid, and might legally have been enforced. All that remains to be considered then is, whether the corporation, either in lieu of, or in addition to such penalty, had a right to treat such obstruction as a public nuisance, and to direct its officers by ordinance summarily to abate it. It has been laid down as a general proposition, that when a corporation is empowered to enforce its ordinances by fine or in any other prescribed manner, it is by implication precluded from adopting any other method of punishing disobedience to them. *Kirk* v. *Nowell*, 1 *T. R.* 124. The question in that case was whether a corporation which possessed a general power of making by-laws, could make a by-law creating a *forfeiture*. Lord Mansfield held that no corporation possessed such an extraordinary power, unless it was expressly given; it being against *magna charta;* and Mr. Justice Buller also said, that considering it a by-law creating a *forfeiture*, the act of parliament not having given this corporation a power to make such a by-law, it was bad on that ground ; and he he held it to be bad for the additional reason, that the act had prescribed in what manner by-laws should be enforced, namely, by *fine* or *amerciament*, and that therefore the corporation was precluded by the act from inflicting any other punishment. This case has been cited by subsequent elementary writers as establishing both those positions. 2 *Kyd on Corp.* 110. *Willcock on Munic. Corp.* page 180, *pl.* 449. *Angel &amp; Ames on Corp.* 200. Considering the ordinance in question as a mere ordinance or by-law, I must confess I do not see how its validity is to be maintained, if the principle laid down by Mr. Justice Buller is correct. But the real question in this case is, not whether the ordinance in question considered as a legislative act, is valid, but whether the corporation had power upon any principle whatever to do the act which the ordinance authorized to be done. The injunction restrained the corporation and their officers from intermeddling with or removing the complainants' float. If that float is a public nuisance, which the corporation had a

right to abate, that right cannot be affected or impaired by their having undertaken in the form of an ordinance to prescribe to their agents or officers the manner in which they should proceed to cause it to be removed. I have already expressed the opinion that this float, considered as an unauthorized obstruction either of the river or the basin, was a public nuisance ; and the books lay down the rule in very broad terms *that any person* may abate a common nuisance; it is so stated by `Viner, tit. Nuisance, T. pl. 3, and W. pl. 4. In *Bacon's Abr. tit. Nuisance* 6, that any one may pull down or otherwise destroy a common nuisance, as a new gate or even a new house created in a highway ; for if one, whose estate is prejudiced by a private nuisance, may justify the entering into another's grounds, and pulling down and destroying it, it cannot but follow *a fortiori* that any one may lawfully destroy a *common* nuisance ; and in *Comyn's Dig. tit. Action upon the case for a Nuisance, D.* 4, it is said if it be a common nuisance, as a gate erected across an highway, every one may throw it down. Blackstone, 3 *Black. Comm.* 7, says, if a new gate be created across the public highway, which is a common nuisance, any of the king's subjects passing that way may cut it down and destroy it. The case of *James* v. *Hayward, Cro. Ch.* 184, is referred to in all those cases in support of the position, and it seems to sustain it. That was an action of trespass for breaking the plaintiff's close, and pulling up and cutting down a gate. The defendant justified, because the gate was placed across the highway, and so fixed *that the king's subjects* could not pass without interruption by reason of the said gate, and therefore he cut it down. The justification was sustained, the court holding it was a common nuisance, which every person had a right to abate, and for the abating of which no action would lie. The language of the court on the second point is, "that admitting it to be a nuisance, although the usual course is to redress it by indictment, yet every person may remove the nuisance, and the cutting of the gate was therefore lawful." There was no averment in that case that the defendant was specially aggrieved by the nuisance. *Houghton* v. *Butler and another,* 4 *T. R.* 364, seems to support the same doctrine ; that was also trespass for break-

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c. of
Albany.

ing down a gate.  The defendants justified on the ground of a right of way over the *locus in quo;* and because the gate was wrongfully erected across the said way, they broke it down.  There was no averment in that case that they were specially aggrieved by the gate,  It seems to be sufficient to shew that the obstruction was illegal, and that the party removing it, either as one of the community at large in the case of a public highway, or by special grant in the case of a private way, had a right to an unobstructed passage there.  Every citizen has a right to an unobstructed passage over the navigable waters and public highways of the state ; and, I apprehend, he may remove any obstruction to his passage, and that it will not be necessary for him to aver in his justification that he was specially impeded by it.  If this be so, I apprehend with the chancellor that this corporation cannot be liable to an action for the exercise of a power which every member of the community possess.  But if the true doctrine be that asserted by the complainants' counsel, that no one but a person aggrieved can remove a public nuisance, the corporation, whose duty it is to preserve the public streets, the docks and slips, and the river opposite thereto, from being in any manner obstructed, may well be considered a party aggrieved by any such illegal obstruction.

If this is a case in which the corporation or any other person had a right summarily to remove or abate this obstruction, then the objection that the appellants by this course of proceeding may be deprived of their property without due process of law or trial by jury, has no application.  Formal legal proceedings and trial by jury, are not appropriate to, and have never been used in such cases.  2 *Cowen,* 819, *n. b.*  8 *Wendell,* 85.

On the whole, I am of opinion that the decree of the chancellor ought to be affirmed ; but I desire to be understood as placing that opinion principally upon the ground that the complainants have failed to shew a case which entitles them to the special interposition and protection of a court of equity, according to the well established principles of that court.

By Mr. Senator ALLEN. It was admitted by the coun-
<span>Dec. 1832.</span>
bany extended to a line drawn through the middle of the <span>Hart</span>
main stream of the Hudson river, and consequently that the <span>v.</span>
basin and pier were within the corporate limits of the city. <span>Mayor, &c. of
Albany.</span>
The appellants deny, however, that the powers of the com-
mon council over the basin extend further than to preserve
and maintain good order within the bounds of the city, and
therefore that the ordinance assuming that the float or ark
of the appellants was a nuisance, and the order to remove
it, were contrary to the powers granted to them by their
charter and the statutes amending it, and was a proceeding
not warranted by the constitution of the state. By the act
of the legislature, *sess.* 49, *ch.* 185, § 15, the corporation are
authorized to regulate docks, wharves or whatever may be
necessary in and about the same; to abate or remove any
nuisances; to regulate bridges, wharves and slips; to pre-
vent all obstructions in the river, near or opposite such
wharves, docks or slips; to prevent the incumbering of the
wharves or slips; to regulate the police of the city; to be
commissioners of highways in and for the city, and gene-
rally to make all such rules, by-laws, and regulations for
the order and good government of the city, and the com-
merce and trade thereof, *as they may deem expedient,* not
regugnant to the constitution or laws of the state; and to
inflict penalties for the violation of any by-law, not exceed-
ing twenty-five dollars for any one offence. These are the
statutory powers possessed by the corporation, and under
which they are authorized to regulate the docks, wharves
and slips; to remove any nuisance from them, and to prevent
obstructions in them. By the terms docks, wharves and slips,
the piers, bulkheads and matters surrounding them, are
meant; and the jurisdiction of the corporation, therefore, for
the above purposes is extended over the waters of the river to
the centre of the same, and every erection in or on it, includ-
ing the basin and pier docks alluded to. By one of the points
made by the appellants, the extent of this jurisdiction is deni-
ed, and it is contended that the basin forms a part of the ca-
nal, and is subject only to state regulation; and they refer to

the act of 1823, *chap.* 111, in support of this position. But, no part of that act, or any other act of the legislature, declares the basin to be a part of the canal ; the act alluded to only directs the canal commissioners to charge tolls on all canal boats entering the basin from the canal, or which shall leave the basin for transportation on the canal, for its entire length, *in the same manner as if it were part of the canal.* If the basin was a part of the canal, why are the words " as if it were" used ?   Evidently to show that it was not a part of the canal, but that the regulation in the payment and receipt of tolls, should be the same as those on the canal.   In their grant to the owners of the pier lots, the legislature no doubt took into consideration the advantages that would result to the canal boats, craft and rafts of lumber, in the accomodation of enterering an extensive basin at the termination of the canal where they could lie secure from flood or tempest, instead of entering the river where they would be exposed to both ; and therefore, as an encouragement to the undertaking, and without doing any injustice to the owners of the boats or vessels who used the basin, they granted certain privileges, such as the toll on the canal boats, and double wharfage on all vessels or other craft navigating the Hudson river which entered tha basin.

The appellants contend also that by the statute, the leading object of the basin was to facilitate transhipments of produce and merchandize ; and that if the ark has tended to effect this object, it is no nuisance.   The preamble of the act of 1832 states that the construction of the baisn would enable transhipments to be made *between canal and river craft* without the cost and delay of cartage and storage.   In passing this act, it is quite clear to my mind that the legislature could not have had in view any such construction as the float or ark, in order that transhipments might be facilitated.   By the words of the preamble, it must have been intended that the transhipments alluded to were those that would probably take place between the canal boats and the vessels navigating the river, employed in carrying the produce of the country to a market, and in no other way.   The word transhipment, according to *Webster* and other lexicographers, is the act of transferring goods from one ship to another.   This float or ark, however, is neither a

ship or vessel capable of being navigated, neither is it a canal boat or a river craft, as its immense size will not permit it to float out of the basin or pass through the canal, nor was it intended for any other purpose than a store house, and therefore the delay of storage is not avoided by its use. It did not come through the canal, and therefore paid no toll, neither did it come through the lock, and therefore has not navigated the Hudson river, and is not subject to double wharfage. It is in fact an erection not in the contemplation of the statute or of the owners of the pier.

The powers of the corporation, it appears to me, are sufficient to authorize the removal of this float or ark, if they shall deem it a nuisance, and injurious to the trade and commerce of the city. One of the specific powers granted to the corporation is to abate and remove any nuisance in any wharf, and to prevent all obstructions in the river near or opposite such wharf. The good government of a populous city requires that the municipal authority should possess in certain cases summary jurisdiction, and it appears to me that the legislature intended by the act of 1826 to invest the corporation of Albany with the necessary powers to remove an obstruction so formidable as the one alluded to. In addition to the power to abate or remove nuisances, they are authorized to forfeit and seize all bread made contrary to the fixed assize. How, it may be asked, are they to abate or remove a nuisance, or cause a forfeiture of bread, except by a summary proceeding? If it is answered that the statute authorizes a penalty of twenty five dollars, I reply, first, that the power to inflict penalties is optional, as is the power to imprison for certain offences, either of which may be inflicted or neither, as they shall deem expedient; second, that the remedy by penalty is incomplete to effect the object : as in the present case, if the corporation had recovered the penalty, the evil would still have remained, the pecuniary advantages accruing to the appellants far exceeding the penalty ; and if they had repeated the action again and again, the mischief would not have been removed, as the advantages to the appellants would enable them to pay any penalty the corporation are authorized to exact. A power to prevent

the continuance of the nuisance, therefore, by means not to be resisted, appears to be essentially necessary, in order to the due administration of justice. Where there is no negative powers in a statute, the court will allow *ex necessitate* a latitude of construction. The construction must be according to the intention, and must be, from the whole taken together. All statutes made for the public good must be expounded in such manner that they may, as far as possible, attain the end of their enactment. It is the duty of judges to give such construction as will redress the mischief and advance the remedy, and to suppress all evasions that may be attempted to continue the mischief. The law will not, by any construction advance a private interest to the destruction of that of the public, but on the contrary, will advance the public interest as far as possible, thought it be to the injury of private interests. Whenever a statute gives a discretionary power to any person, to be exerised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of the existence of those facts. It is no answer that such power may be abused, for there is no power which is not susceptible of abuse. 14 *Petersdorff*, 513. 1 *Strange*, 253. 12 *Wheaton*, 31. The construction I have given the act of 1826 is in accordance with the foregoing precedents, which authorizes, as I think, the conclusion I have arrived at, that ample power was delegated by that law to remove the evil complained of.

If, however, I should be wrong in the construction of the statute, I think it can hardly be disputed that the obstruction may be removed as a common nuisance. *Blackstone* defines a nuisance to be whatever unlawfully annoys or doth damage to another ; and such nuisance may be abated, that is, taken away, or removed by the party aggrieved thereby, so as he commit no riot in doing it. *Burns* says, it seems to be certain that any one may pull down, or otherwise destroy, a common nuisance, for if one whose estate is or may be prejudiced by a private nuisance, may justify the entering upon another's ground and destroying such a nuisance, it cannot but follow *a fortiori* that any one may lawfully destroy a common nuisance ; and as the law is now holden it seems that in a plea

justifying the removal of a nuisance, a man need not show that he did as little damage as might be. 3 *Black. Comm.* 5. 3 *Burns' Justice,* 222. Is not then the float or ark a common nuisance ? The ark is represented by the appellants to be 120 feet in length, and 42 feet in width ; they are in possession, as tenants, of only 110 feet on the pier, in front of which the float or ark is moored. It appears, then, that the ark occupies ten feet more of the waters in front of the pier than what is owned by the appellants. It is permanently fixed at this place by piles driven into the bottom of the river or basin, to which it is fastened. By the diagram annexed to the answer it is shown that the float lies immediately in a line with the lock or entrance into the basin, and must, therefore, more or less obstruct the free navigation of it. The act of 1823 provides, that no wharfage or other charge shall be exacted from the canal boats or other craft, or rafts of lumber entering from the canal, for lying along side the pier or bridges. Here is a general permission for the canal boats and rafts of lumber to lay at the pier free of expense, and to them, therefore, the float which occupies permanently 120 feet of this pier, must be an obstruction of the privilege granted by the act. By the act of 1828, chap. 164, the corporation are authorized to excavate and deepen the basin in front of any pier lot, the expense to be apportioned among the lots, and paid by the owners or occupants thereof. The operation of excavating, however, is obstructed by this float, permanently fixed as it is by piles driven into the bottom of the basin. The petition of the owners and proprietors of the pier lots set forth in the answer of the respondents represents the float as injurious to their rights and property, and as an improper use of the basin, by the persons who have placed the float in it, and as an impediment to its use by others. And the respondents charge, that the float or ark is an obstruction to the free navigation of the basin, and that it never was the intention, in the construction of the basin, that this description of hulk should be accommodated within its waters. Here, it appears to me, is obstruction enough to constitute a common nuisance, which does unlawfully annoy, or doth damage, 1. To those entering the basin ; 2. To the boats and rafts of lumber entering the basin through the canal ; 3.

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c. of
Albany.

To the corporation in preventing the excavation of the basin ; 4. To the owners and proprietors of the pier lots, as injurious to their rights and property ; and 5. To the respondents, and the public generally, in preventing the free navigation of the basin, and as otherwise injuring the trade and commerce of the city. If the principles contended for by the appellants be correct, however, and they cannot be obstructed in the free use of any means to facilitate business within the basin which are not expressly prohibited by legislative enactments, then, if the ark was moored in any other part of the basin so as to obstruct its navigation in a much greater degree than it now does, or if a number more of these floats were erected, and thus a large portion of the basin obstructed, there would be no remedy, as the building and mooring of such a structure is not prohibited, in so many words, by the statute. That this doctrine is clearly untenable, is evident, from the following authorities : The case in 1 *Dallas*, 150, is directly in point, and involves similar principles to that under consideration. It was a nuisance in erecting a wharf on the public property, and the case before us is the erection of a float or ark on the property of the public, or property under the jurisdiction of the public authorities. The defendant offered to show, as in the present case it was insisted, that the erection had been beneficial to the public, and therefore not to be regarded as a nuisance. The court held, however, that the evidence was inadmissible for two reasons: 1. Because it would only amount to matter of opinion, whereas it is on facts the court must proceed, and the necessary facts are already in proof ; 2. Because it would be no justification, for on the same principle that the defendant might carry out his wharf twelve feet, he could justify the extending it further, or any other man might claim a right to a similar intrusion. Suppose, for instance, a street were sixty feet wide, twelve feet might be taken off it without doing any material injury to the public property, or creating any great obstruction to passengers ; yet surely this will not justify any man's building upon and assuming the property of the twelve feet that could be thus spared. *The Queen* v. *Leach*, 6 *Modern*, 145, is also a case in point. The nuisance complained of was, that the defendant had brought a large ship of 300 tons into a dock, which was a common

dock for the accommodation of small vessels. It was excepted by the defendant that it is inconsistent to say that a place is a common dock, and that it is a nuisance for a large ship to come there, for a common dock, in its nature is free for all ships. But the court held that there might be a common dock for small ships, as well as a common pack and horse way, and if a man with a cart use such way, so as to plow it and render it less convenient for riders, will not that be a nuisance? The principles upon which these cases were decided will apply with peculiar force to the one under consideration ; for, as in the one case, if twelve feet may be obstructed by one man, so may it be done by another, and if the appellants may occupy permanently 120 by 42 feet in the basin, so may another do it ; and in the other case, if one may float or place a hulk or vessel in a dock intended and constructed for the accommodation of small vessels, so may another ; and in like manner, if the appellants may occupy the basin, which was intended for the accommodation of canal boats and river craft, with this immense float, so may others also, and there is no point at which the evil could be arrested, until it destroyed the accommodation afforded by the basin all together. The case of *Charleston Bridge*, v. *Warren Bridge*, 6 *Pick*. 398, may also be referred to, as bearing upon the subject. This was a bill praying an injunction, to restrict the defendants from erecting a bridge in the immediate vicinity of that of the plaintiffs. Chief Justice Parker observed, without doubt this is such a case as the legislature contemplated, for the remedy is incomplete. Nothing short of an absolute prevention of the evil is a competent remedy, and a court of common law is incompetent to afford this ; an injunction was accordingly granted. In the present case also, nothing short of an absolute removal of the evil is a competent remedy, and an application to a court of law, to enforce the penalty authorized in ordinary cases, will not cure the evil.

It was further insisted by the appellants, that the ordinance of the corporation was unwarranted by the constitution of the state and by the statutes which confer and define the powers of the common council. I have attempted to shew that the corporation had the authority, by the statute of 1826, as a po-

lice regulation, to pass and enforce the ordinance complained of; and I will only refer to the cases, 7 *Cowen*, 585, 588, and 5 *id.* 538, where an ordinance of the corporation of New-York is decided a constitutional act, and where it was held by the supreme court, that the act of the legislature under which it passed is not unconstitutional, either as impairing the obligation of contracts, or taking private property for public use without compensation, but stands on the ground of being an authority to make police regulations in respect to nuisances. See also *Barker* v. *Jackson*, 1 *Paine*, 559, and *Lindley* v. *Commissioners*, 2 *Bay*, 38.

My opinion, however, is grounded upon the authority delegated to the common council of the city of Albany by the acts of the legislature, where, as I think, the power is expressly given to correct the evil complained of, as a police regulation to abate a common nuisance, or as commissioners of highways to remove an obstruction.

I am of opinion, therefore, that the decree of the chancellor ought to be affirmed.

By Mr. Senator EDMONDS. Several questions are presented for our consideration in this case. Some are of a character that do not necessarily involve the merits of this controversy, and their decision would lead more to the continuance of unprofitable litigation than to that speedy adjustment of the rights of the parties which ought to be the aim of courts of justice. The main question relates to the rights and powers of the respondents as a corporation, and if the conclusion to which I have arrived upon that point is correct, it would be a useless expenditure of time to examine the other questions to which I have already alluded.

The vessel erected by the appellants in the Albany basin is not intended for the purposes of navigation on the river or the canal, but is in fact a floating store-house, calculated to remain stationary in the basin. This constitutes its entire utility, if not its greatest value, to the appellants. Its continuance will give to them the exclusive use of so much of the basin as is occupied by it, and their right to this use we are called upon to determine. The appellants do not set up any

right peculiar to themselves and denied to other citizens. The privilege they claim, they admit, belongs to every owner or lessee of pier lots, and a very navigator of the Hudson river. They do not pretend to any grant of this right to themselves, or to have paid any adequate compensation for the great benefits they may derive from its exercise ; they claim it solely in their character of lessees and navigators. They do not admit that they are limited in their privilege to the space now covered by their erection ; two, three, or four times that space may as well be occupied by them, and that occupation be as well defended under their present claim. If the claim is well founded, I can discover nothing to restrain these appellants, or any other owners or lessees of pier lots and navigators of the river, from so increasing these floating store-houses, both in size and number, as to cover the entire face of the basin and wholly interrupt any passage upon its waters. I can have no hesitation in saying that such an use of the basin was never intended. The statute which authorized the construction of the basin, *laws of 1823, p. 128, ch. 111*, clearly defines its object and its use. Section one speaks of a basin for the accommodation of canal boats, vessels and other craft and rafts of lumber. Section four directs the erection of bridges, with a draw in such manner that vessels and boats can at all times *pass through* the same with convenience and despatch. Section five authorizes the grant of land to the company, with the reservation that no wharfage or other charge shall be exacted from the canal boats or other craft or rafts of lumber *entering from the canal and using the waters of said basin, or passing through the same* into or from the Hudson river, or for laying along side the said pier or bridges. Section six authorizes the collection of certain rates of wharfage from all vessels, boats or other craft navigating the Hudson river *and entering into the said basin.* Section nine directs the construction of a sloop lock, and authorizes the collection of tolls from all canal boats, crafts and lumber which shall enter into the basin from the canal, or which shall leave the basin for transportation on the canal, *computing the entire length of the said basin in the same manner as if it were a part of the canal.* These provisions indicate plainly that a free navigation of the

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c. of
Albany.

basin was intended as well by the legislature as by the com-
pany—a navigation which, in the language of the preamble
to that act, " would be not only extremely beneficial to the
trade of said city, but a great accommodation to *all persons*
carrying produce or merchandize to and from the city." It
is true that that preamble supposes these benefits would re-
sult from the fact that the basin " would enable tranship-
ments to be made between canal and river craft, without
the cost and delay of cartage and storage." But how are
these advantages in transhipment to be obtained? By prac-
tices which might ultimately cover the basin with floating
store-houses, so that canal and river craft could not navigate
its waters? or by any devise which, while it would produce
the saving of the cost and delay of cartage and storage,
would cause a permanent obstruction to the free navigation
of all parts of the basin? It is contended by the appellants
that the latter is the true meaning of the preamble, and that
their erection is within the intention of the statute as derived
from this construction of the preamble, inasmuch as it is
peculiarly adapted to facilitate transhipments and reduce
their costs and delay. Conceding this to be a correct view
of the preamble, it would be sufficient to say that it is a
well established principle, that a preamble can never be of
any binding force in construing a statute in a manner hostile
to the clear and obvious meaning of its subsequent enact-
ments. But were the rule otherwise, I could not acknow-
ledge the correctness of the appellants' construction of that
preamble; for it must be borne in mind that the trade of
the whole city, not of any particular individual, is to be
benefitted by the basin, and that *all persons* carrying pro-
duce or merchandize, are to be greatly accommodated by it.
The object of the statute, then, is to produce the greatest
amount of public good; and this, I apprehend, cannot be ef-
fected by granting to the appellants the exclusive right of per-
manently occupying a part of the basin, or by sanctioning a
practice which might ultimately cover its whole waters with
floating store-houses, to the exclusion of vessels navigating
the canals and the river, but can be best produced by that
course which the wisdom of the legislature has provided, to
wit, as free a navigation of the waters in the basin as is al-

ready secured to our citizens in the river and on the canal. ALBANY, Dec. 1832.
If erections like that now in question had been contempla-
ted by the act of 1823, it must have been as obvious to the Hart v. Mayor, &c. of Albany.
legislature then as it is to this court now, that the absence of
any provision limiting them as to size and number might, and
indeed would result in converting the basin into a collection
of floating store houses, to the exclusion of free navigation on
its waters. It would in that event be very natural to inquire
why the act should speak of a basin for the accommodation
of canal boats; why provide for a free passage for boats
through the bridges; why forbid wharfage upon boats pass-
ing through the basin; why construct a sloop lock; and,
above all, why direct the collection of tolls in the same man-
ner as if it were a part of the canal? It is obvious, then, that
the use which the appellants are making of the basin in the
instance now under consideration, is in violation of the law
which directed its construction, is not warranted by their
rights as lessees of pier lots or as navigators of the Hudson
river, and is without color of lawful authority.

But have the respondents the power to redress the evil
or punish the appellants for their usurpation? This is the
most important question in the case, and demands our
consideration, not merely because the appellants seem to
have rested their claim less upon the strength of their own
right than upon the weakness of the respondents' power,
but also because our decision may materially affect those
chartered rights which have been conferred upon the city
of Albany, and other corporations of a similar character,
for the advancement of the public good. In support of the
power exercised by the respondents in the case before us,
we have been referred, first, to their act of incorporation
and the powers therein specifically granted, and second,
to their right at common law as a corporation to abate
and remove all nuisances within their jurisdiction. The
original charter of the city of Albany, granted by the
royal government in July, 1686, and under which and the
several acts amending it, its municipal authority was ex-
ercised until 1813, extended the bounds of the city into the
river no farther than low water mark. In 1813 a new

charter was granted, 2 *R. L.* 461, and in 1826 the charter was renewed by the legislature, and the various laws relating to the city were combined into one act. *Laws of* 1826, *sess.* 49, *ch.* 185, *p.* 184. By these statutes, the bounds of the city were extended to the middle of the river, 2 *R. L. of* 1813, 462, 3 *R. S.* 6, § 16, 17, *id.* 123, § 2, and thus included within its limits the place where the float of the appellants was stationed. This fact being undisputed, the respondents claim that the 15th section of the act of 1826 gives them power to direct its removal and destruction—*First,* because they are authorized to establish and regulate docks, wharves, or whatever may be necessary in and about the same. By the original charter of 1686, section 4th, the unappropriated land lying within the limits of the city and extending to low water mark, and all the profits, benefits and advantages that might arise from anchorage or wharfage in the harbor, port or wharf of the city, were granted to the respondents. By the act of 1823, relative to the construction of the basin, the erection of wharves on the outer side of the pier was evidently contemplated; for the proprietors of the pier are empowered to charge wharfage on all vessels lying in the Hudson river at the said pier or mole on the east side thereof, and forbidden to charge wharfage on canal boats lying on the west side. It is evident, then, that at the passage of the law of 1826, it was known that there were wharves and docks on both sides of the basin, and we are not at liberty to say that that act related to those only on one side. *All* docks and wharves in the city were included within the provisions of the 15th section, to which I have already adverted, and the power of the respondents was as great in regard to one as the other. That power was to regulate not only the wharf, the perpendicular bank for lading vessels, but the dock, the place in which the vessels entered also, and all things necessary in and about the same. The act of 1823 provided that the basin should be so kept open that canal boats, &c. might enter from the canal, use the water or docks of the basin, and lay along side the bridges or wharves of the pier without charge; and if the float of the appellants in any manner interfered with or obstructed this free use of such docks and wharves, it was highly necessary and proper that

the respondents should so exercise their power of regulating as to prevent such interference and remove such obstruction.

*Second.* Because the respondents are authorized to abate or remove any nuisances in any street or wharf, or on the lot or enclosure of any person. I will not now stop to inquire whether the float of the appellants is a nuisance or not; if it was conceded to be such, it would not give to the respondents jurisdiction under this clause of their charter. The basin, or water in which this float rests, does not come within the description of places mentioned here, and a nuisance within its borders cannot, I apprehend, be removed under this part of their charter.

*Third.* Because they are authorized to make rules, by-laws and regulations for the good order and government of the city, and the commerce and trade thereof. It has already appeared that the object of the legislature in authorizing the construction of the basin was, that it might be extremely beneficial to the trade of the city. The mere construction of the basin was not of itself sufficient to effect that object; it was necessary that a proper use of it should be produced and continued, and the power to protect such a use of it must rest somewhere. It was not deposited with the canal commissioners, for their duty in regard to the basin is special in its character, clearly defined, and does not include the requisite authority in this respect. Nor was it given to the proprietors of the pier; their rights and interests are also clearly marked out and exclude this power, and it is manifest to me that it was intended by the legislature that it should be deposited with the respondents. They were the representatives and the servants of that people, for the benefit of whose trade the basin was to be constructed; they had in 1823 the same power to make rules for the good order and government of the trade and commerce of the city which existed when they passed the ordinance in question. The legislature had extended their limits so as to include the land covered by the waters of the basin, and confirmed their jurisdiction over the trade, for the advancement of which it had been constructed. I am therefore of opinion that it was the right and the duty of the respondents to guard against such an use of the basin as

should be injurious to the trade and commerce of the city, and that two several parts of their charter required their interference with the erection of the appellants.

But how was their power in the premises to be enforced ? Their charter gave them the right to impose fines and inflict imprisonment upon violators of their regulations. This, it is averred, was not sufficient in this instance to enforce an observance of those regulations, and the respondents contend that they had a right to resort to such means as were necessary to render their corporate powers effectual. I cannot acknowledge the justice of this claim ; it is fraught with great danger to the citizen, and is at war with the spirit of all our institutions ; if allowed in this instance, it will be impossible to fix any limits to its usurpations. The common council of 1831 might be content with believing that a destruction of a part only of a transgressor's property would be sufficient to produce obedience to their laws. Their successors may, however, think that an amerciament of all his property would alone be adequate to that purpose, while others may persuade themselves that perpetual imprisonment and the loss of life itself could alone produce the desired result. Life, liberty and property are not thus to be hazarded at the will of a tribunal which was intended to be local in its jurisdiction and limited in its authority. It is the constant tendency of power to increase its strength, and it becomes courts of justice to guard against its encroachments, however specious the pretext or however strong the necessity for its exercise. The current of authorities is also against this claim. The only cases cited by the counsel for the respondents in support of their position were *Pierce* v. *Hopper*, 1 *Strange*, 253, *and* 14 *Petersdorff's Abr*. *N. Y. ed*. 515. The former is merely the language of counsel, and no authority ; the latter is a note by the editor that "where an act of parliament enacts any matter or thing, it tacitly gives the right of carrying it into effect by all legal means ; and therefore, though the words used are not express as to all matters necessary for the purpose, the court will so construe the statute that its object will be attained." Even if this language was sufficient to sustain the position of the counsel, (which I will not allow,) its tenor and extent will

be best ascertained by a reference to the cases cited by the editor in support of his doctrine. The first case is *Regina* v. *Simpson*, 10 *Mod.* 284, which was a conviction before a magistrate for deer stealing upon the statute, 3 *and* 4 *Wm. & Mary, cap.* 10. No way of proceeding by the magistrate was provided by the act, and Parker, chief justice, ruled that it was more agreeable to the common law, that the delinquent should be summoned than arrested on a warrant. The other case is *Rex* v. *Sleventon and others*, 2 *East*, 362, where the question was stated by Grose, justice, who delivered the opinion of the court, to be whether the statute, 26 *Geo.* 3, *chap.* 77, § 13, *extends* to proceedings before the commissioners of excise and justices of the peace ; not whether they fall within the legal definition *of a court*, but whether the legislature in this clause meant to comprehend them ? To shew that they were not meant to be comprehended, it was said by him to be a circumstance of some weight, that in no act which was produced by the defendant were they so described ; and upon looking through the several acts, it was clear that they were intended not to be comprehended. These cases do not, it is apparent, warrant the construction which the respondents' counsel have put upon the language in Petersdorff, and do not sustain the position they have assumed. On the other hand, there are many cases which clearly establish the contrary. In the case of *Kirk* v. *Nowell*, 1 *T. R.* 118, the defendants justified under a by-law of a corporation which was authorized by its charter to ordain certain by-laws, and to impose such reasonable pains, punishments and penalties *by fine or amerciament, or by either of them*, upon all those which they should find offending contrary to those laws, as to them should seem meet, and the same *fines and americaments* to levy and receive to the use of the said corporation. The act for which the defendants were prosecuted was the seizure of some property manufactured contrary to such by-law, and which seizure was authorized by the by-law. Lord Mansfield said that such a corporation, with a power of making by-laws, cannot make any such law to incur a *forfeiture*. No such extraordinary power of making by-laws to incur a forfeiture appearing upon the plea, it was impossible for the court to say that this by-law could be support-

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c. of
Albany.

ed by the act; and Buller, justice, is still more explicit: his language is, that the act prescribed in what terms by-laws should be enforced, namely, by fine and amerciament, therefore the corporation was precluded by the act from inflicting any other punishment. In the case of *The Mayor, &c., of N. York* v. *Ordrenan, Johns. R.* 122, the question arose upon the validity of a by-law which imposed a penalty of $125 for *every* hundred weight of gunpowder that should be kept contrary to its provisions. The charter of N. York empowered its common council to pass ordinances for regulating the keeping, carting, conveying or transporting of gunpowder, and to impose penalties for the non-observance of the same *not exceeding* $250, &c. The supreme court declared the ordinance void, because the charter had clearly manifested an intention that no more than that sum should be exacted as a penalty for any one offence, or for the violation of the by-laws in any one transaction; and *Spencer*, justice, remarks that should a different construction prevail, the limitation in amount of the penalty would be nugatory, and the by-law was a plain and manifest excess of power in inflicting a penalty and applying it, not to the *offence* itself, but to the *quantity* of the offence, thus transcending the limitation of the penalty fixed by the legislature. The cases of *Dunham & Daniels* v. *Trustees of Rochester,* 5 *Cow.* 462, *& Stuyvesant* v. *Mayor &c. of N. York,* 7 *Cow.* 588, are to the same point; in the latter of which cases, the court say that to be a corporation is a franchise; and all our aggregate corporations enjoy the prerogatives of government to a prescribed extent. Among these is the power to pass by-laws upon certain subjects. They cannot transcend the powers conferred on them by statute; this is their constitution: every act beyond the constitution is void, and may be declared so by our courts of justice, whether it emanate from a general or local legislature. Hence, these respondents had no power in their charter to ordain a *forfeiture* of the float, or to enforce their by-laws by other means than fine and imprisonment. I have arrived, then, at the conclusion that the respondents were within the scope of their jurisdiction when they legislated in regard to the float of the appellants, but that they exceeded the powers delegated to them by their charter in the manner in which they attempted to ex-

ercise their rights. If this case stopped here, there would be no hesitation in awarding our judgment because of the latter defect against the respondents.

But it is contended that the float is a nuisance, and that the corporation had a right as a person in law to abate and remove it. It was not denied on the argument that the respondents as a "person in a political capacity created by the law," had an equal right with natural persons to abate nuisances, but it was averred on the part of the appellants that the float was not a common nuisance, and that if it was, the respondents were not prejudiced by it in their corporate character and therefore could not abate it. Is it a nuisance of so common or public a nature as to justify its dejection? A common nuisance is that which worketh hurt, inconvenience or damage to all the king's subjects, and not merely to some particular person; 3 *Bl. Comm.* 5, 216; 4 *id.* 167; or that which is to the common nuisance of all passing by. *Vin. Abr. tit. Nuisance, A.* 1 *Hawk. b.* 1, *ch.* 75, § 1, 4. 12 *Petersdorff, Abr.* 792, *in notis.* 3 *Burns' Jus.* 221. Thus it was held to be a common nuisance for a ship of 300 tons to come into Billinsgate dock, to which all *small* ships coming with provisions to the markets of London might come, but that no great ship ought or used to come there. *Queen* v. *Leich,* 6 *Mod.* 145. So of a gate placed on the highway, and so fixed that the king's subjects could not pass without interruption, *James* v. *Hayward. Cro. Ch.* 184. So to divert part of a public navigable river, whereby its current was weakened and made unable to carry vessels of the same burthen it could before, *King* v. *Mansfield. Noy.* 103; or laying timber in a public river, although the soil on which it is laid belong to the party, provided it obstructs the necessary intercourse. 3 *Bacon's Abr.* 686. *Str.* 1247. 1 *Hawk.* 363 *n.* 1. So it was held to be a nuisance for a waggoner to keep one or more waggons constantly before his store-house in the public street, although there was sufficient room for two carriages to pass abreast on the opposite side of the street, *King* v. *Russel,* 6 *East,* 427; or for a stage coachman to stand with his coach in a particular part of the street for an unreasonable length of time, waiting for passengers, *Rex* v. *Cross,* 3 *Campb. R.* 224; or for a man to erect a wharf on the public property,

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c of
Albany.

although its erection might be beneficial, and sufficient room be left for a free passage in the river, *Respub.* v. *Caldwell,* 1 *Dallas,* 150. There cannot then be any doubt that the float of the appellants, permanently located as it is in the basin, which was constructed for public purposes, and to which the appellants have no right further than any other citizen navigating its waters, is a common nuisance. Its character is not altered by their not having, as in 6 *East,* occupied the whole basin, nor by benefitting a portion of the public, as in 1 *Dallas,* or by owning the adjacent pier lots, as in *Strange.* It is sufficient to know that they have, without right, appropriated to their own use a portion of that which was designed for the benefit of all ; that they have obstructed the free navigation of this public basin, which was the primary object of its construction, and have adopted a practice which, if sanctioned, would result in the entire destruction of public and common benefits.

Nor do I entertain any doubt that the respondents as a corporate body, had a right to abate the nuisance. Any person may abate a common nuisance. Such I understand to be the language of the cases. See 2 *Salk.* 458. 2 *Roll. R.* 31. *Vin. Abr. tit. Nuisance, T.* § 3, *W.* § 4. *Cro. Car.* 184. 3 *Burns' Justice,* 224. *Hawk. B.* 1, *ch.* 75, § 12. These cases contain no limitation of the power of abating nuisances to those prejudiced by them. Some cases, however, are of that character. Blackstone, 3 *Comm.* 5, speaking of common and private nuisances, says they may be abated by the party aggrieved. In *Viner's Abr. tit. Nuisance, W. and V.* it is said that a common nuisance may be abated or removed by those persons who are prejudiced by it, and they are not compellable to bring actions to remove them ; but it is also said on the same pages without qualification, in one place, that *every man,* and in another that *any person,* may abate a common nuisance. In *Petersdorff, Abr. tit. Nuisance, IV. n.,* it is laid down that. a nuisance may be removed by the party grieved entering and abating it, and that the same rule applies to public nuisances : and in support of the latter position reference is made to the case of *James* v. *Hayward,* which I have already cited from *Cro. Car.* 184. But that case is explicit in saying that *any*

*person* may abate a common nuisance. It is not, therefore, clear to me that the rule as to a common nuisance is to be understood in this qualified sense. In the case of a private nuisance it is undoubtedly true that its removal can only be lawfully affected by the party aggrieved, and if the rule were the same, in regard to a public nuisance, I do not well see how that changes the power of dejection, or how the case of the appellants could be aided by it, for a common nuisance is an unlawful act, whereby the whole community is injured ; all, therefore, are aggrieved, and all have a right to abate it. Testing this case, however, by the rule in the qualified sense for which which the appellants contend, I apprehend that the right and power of the respondents are not changed by it. The injury produced by the float in question is to the trade of the city of Albany. How can it otherwise than aggrieve those, who, by the charter, are clothed with the right and the duty to watch over and protect that trade, and to make such rules and regulations for its good order and government as will best advance the interests of the whole. Created, then, as a corporate person by their charter, and clothed thereby with certain interests in the trade injured by the nuisance in question, the respondents had, in my opinion, a right to abate and remove it ; but they had no right to convert the materials, of which that nuisance was composed, in any degree to their own use, or to remove the materials farther, or otherwise than was necessary to abate the nuisance. 3 *Burns' Justice*, 224. *Dalt. C.* 50.

Much stress was laid by the counsel for the appellants upon the fact that the exercise of the right claimed by the respondents would result in the destruction of their property, without the benefit of a trial by jury, and that consequently the ordinance in question was a violation of the constitution and the bill of rights. The same odjection would apply to the dejection of every nuisance, yet nothing is clearer or better settled than the right to exercise this power in a summary manner, not only where the whole community is affected, but where a private individual alone is injured. It is a right necessary to the good order of society, and the reason why the law allows this private and summary method of doing one's self justice is

ALBANY,
Dec. 1832.

Hart
v.
Mayor, &c. of
Albany.

because injuries of this kind, which obstruct or annoy such things as are of daily convenience and use, require an immediate remedy, and cannot wait for the slow progress of the ordinary forms of justice. 3 *Black. Comm.* 5. But while this self adjustment of injuries is allowed in this and other instances, the law has wisely thrown around its exercise those safeguards which protect the citizen from the exercise of undue force and the peace of society from those riots which might result from it. When such danger threatens, then, and then alone is a resort to courts of justice compelled. The destruction of the thing which constitutes the nuisance, when its dejection can be produced only by such destruction, is not sufficient to compel a resort to courts as the only mode of redress. *Vin. Abr. tit. Nuisance, S. T.* 1 *Hawk. B.* 1, *ch.* 75, § 12. 2 *Salk.* 459. *Sir W. Jones,* 225. *Pet. Abr. tit. Nuisance, IV.* The appellants then have no cause of complaint that the nuisance which they have produced can be abated only by its destruction. It is their own fault that they have expended large sums in erecting a vessel which is a nuisance in the eyes of the law ; and of such a size that it cannot be removed without being torn to pieces. So far then as it may be necessary to take this vessel to pieces in order to remove it, the respondents have a right to go, and no further.

The injunction was general in its terms, restraining the respondents, their officers, servants and agents from intermeddling with the float or ark, and I am of opinion that it was rightfully dissolved.

By Mr. Senator TRACY. I concur in the result of Mr. Justice Sutherland's opinion, that the decree of the chancellor dissolving the injunction, be affirmed, but I put this concurrence expressly on the grounds that the complainant's right to maintain their float in the basin is not sufficiently clear and indisputable to entitle them to the extraordinary interposition of the court of chancery for its protection, and that the complainants do not show that the injury they might sustain by its destruction would be remediless at law.

I do not consider the question whether the float was or was not a common nuisance to be so necessarily involved in the case as it is presented to us, as to require the solution of it.

Nor do I intend to express an opinion whether the common council has the jurisdiction it claims over the basin, and much less do I concede it to the legislative power which it has assumed in the ordinance.

On the question being put, *Shall this decree be reversed?* Two of the members of the court voted in the *affirmative*, and TWENTY-ONE in the negative. Whereupon the decree of the chancellor was *affirmed.*