## N. Y. SUPERIOR COURT.

### FREDERICK HOEFT and others agt. EDMUND B. SEAMAN and JAMES M. THOMPSON.

The *Commissioners of the Department of Docks* of the city of New York have authority by statute to give a written permit to a person to use the side of a *pier* in the city and the water adjacent thereto, for a *floating bath*, to carry on the business of a bathing establishment, during the pleasure of the board, with the consent of the lessee of the pier.

The act of 1871 provides that the powers and duties therein conferred upon the dock commissioners shall not affect the powers of the *harbormasters* as now defined by law. But the powers and duties of these several officials, as defined by statute, are wholly distinct and separate.

The harbor-masters have no power to remove such floating bath without its being established either that it is an essential interference with *navigation*, or that a necessity exists for its *immediate* use for the purposes of commerce. Until one or both of these questions of fact are determined, the owner of the bath will be protected in his lawful possession by *injunction*.

*Argued July, decided October*, 1873.

MOTION to continue an injunction.

The plaintiffs are the owners of a floating bath, known as Hoeft's bath, which is now, and for the last eight years has been moored in the waters of the East river, adjacent to and immediately south of pier No. 55 East river, and is fastened to the pier.

In May, 1873, the commissioners of the department of docks gave the plaintiffs a written permit to use the lower or southerly side of the pier, and the water adjacent thereto, for the business of a bathing establishment during the pleasure of the board.

The pier is leased (by whom it does not appear) to one Quimby, who has consented to the use of the pier and slip by the plaintiffs.

The defendant Seaman is captain of the port, and the defendant Thompson one of the harbor-masters of the city of New York, who, it is alleged, acting under the direction of the captain of the port, has ordered the removal of the bath; and has threatened to use the necessary force to remove the same, if it is not removed by the plaintiffs.

Upon these facts a temporary injunction was granted, restraining the defendants from interfering; with an order to show cause why the injunction should not be made permanent.

The defendants, upon the return of the order, alleged that the bath-house obstructed the use of the waters of the river for the purposes of commerce; and that, acting under authority of law, they had directed its removal.

It was not alleged that, at the time the order for removal was given, there was any *impending* necessity for it; or that there was any application for the immediate use of the slip by ships or other vessels, or for any other commercial purpose; the allegation in that regard being that the vicinity of such pier has been the point or place where large quantities of marble, imported from Italy and other foreign countries, have been discharged; and that there is no other so suitable a place for its discharge. But it is not alleged that there was any occasion for its *immediate or present* use for any purpose connected with the commerce of the river.

The bath-house occupies a space in the waters of the river of 110 by 70 feet; and one end of the structure extends beyond the bulk-head some thirty feet.

ALBERT MATHEWS, *for plaintiffs.*

*First.* The *plaintiffs* are in *possession* of the premises, and it is incumbent on the defendants (in order to justify their

attempted interference) to show some *legal authority* to control the plaintiffs' possession. The *defendants* do not claim as representing *the people* or *the public*, but solely as "*harbormasters*" with restricted statutory powers. Even if it were conceded that this bath-house is a "*public nuisance*," still the *defendants* have no power to remove it unless in discharge of their *duties* (*F. P. Bridge Co.* agt. *Smith*, 30 *N. Y. R.*, 62.)

*Second.* The plaintiffs' right and title to *possession* is derived by strict legal authority as *sublessees* of the owner of the *locus in quo*, viz., the corporation of the city of New York, fortified by authority derived from the legislatnre of the state.

I. Pier No. 55 and its *rights*, easements and appurtenances are now leased to *Ezra Quimby*.

II. Ezra Quimby has *sublet* the portion thereof occupied by plaintiffs to them, and they pay him an annual rental of $900 for the privilege.

III. In addition to this, the plaintiffs have the "*permit*" so to use and occupy the premises from the "*commissioners of the department of docks in the city of New York*," who derive their *powers* directly from the legislature of the state.

*Third.* The whole subject-matter of the *regulation and control* of the use of the "*wharf property*" in question where this *bath-house* lies is under the *exclusive jurisdiction* of the common council of the city and these *dock commissioners*, appointed under the state authority (*Act of April* 5, 1870, *vol.* 1, *p.* 390, § 21, *sub.* 22, *and* § 99; *act of April* 19, 1871, *vol.* 2, *p.* 1235, § 6, *sub. secs.* 2 *and* 12; *act of May* 16, 1872, *vol.* 2, *p.* 1784, *chap.* 738).

I. This "wharf, pier and dock," and its appurtenances and easements, and waters adjacent thereto, are the *private property of the city of New York.*

II. The "*commissioners of the department of public docks*" are *officers* appointed by the mayor of the city of New York under legislative authority.

Hoeft agt. Seaman.

III. These "*commissioners*" have "*exclusive charge and control*" * * "of *all the wharf property belonging to the city of New York*," * * "including all the wharves, piers, bulk-heads and structures thereon *and waters adjacent thereto*, and all slips, basins, docks, water fronts, lands under water and structures thereon, and the appurtenances, easements," etc., etc. (*Act of* 1870, *vol.* 1, *p.* 90, §§ 32, 38 *and* 43 ; *act of* 1871, *vol.* 2, *p.* 1235, § 6, *sub. secs.* 2 and 12).

IV. The common council alone can interfere in respect to the *use* of the slips occupied by the plaintiffs (*Act of* 1870, *chap.* 137, § 21, *sub.* 22; *Vandewater* agt. *The City of New York*, 2 *Sand. Rep.*, 258). By *section* 21, *subdivision* 22, they have power to pass ordinances "in relation to the construction, repair, care and use of docks, wharves, piers and slips" (*Mayor, etc.*, agt. *Ryan*, 2 *E. D. Smith, p.*, 368).

*Fourth.* The defendants have no right, power, authority or control over the plaintiffs or their "*floating bath-house*." It lies *harmlessly* within one of the "*wharves, docks or slips*," which belong to the mayor, aldermen and commonalty of the city of New York, under its ancient charters, as its *private property*. The city corporation has also *exclusive jurisdiction* in the premises in every respect, *under its charter*, as part of its *sovereign prerogative*, and under the *police power* over the slip (as a public way) remitted to it by the legislature of the state, *except* so far as by express enactment the state may have lawfully *resumed* the sovereign power and control over the city's water rights by some explicit *police regulations* conferred upon other parties.

I. The "harbor-masters for the port of New York" are *state officers* appointed by the governor (*Act of May* 22, 1862, *p.* 978, *chap.* 487, § 1).

II. Their powers and duties respecting "*piers, wharves and slips*" in the city of New York are valid only as required by the necessities of the marine commerce of the city. The *act* creating them (*even as respects those wharves and slips which are the property of private citizens*) is con-

stitutional and valid *only* so far as it is necessary as a *police regulation of the subject-matter not otherwise provided for* (*Act of May* 22, 1862, *chap.* 487, § 7; *Vanderbilt* agt. *Adams*, 7 *Cowen Rep.*, 750).

III. The act *defining* their powers (and repealing all other acts) *only* authorizes them to provide and assign suitable accommodations for all "*ships and vessels*" (and to regulate *them* in the stations *they* are to occupy at the wharves and in the stream), and remove such as are not employed *in receiving and discharging their cargoes, to make room for such others as require accommodation to receive or discharge their cargoes*" (*Act of* 1862, § 7). It does not purport to give the harbor-masters further police power, or to give them power to intermeddle with the use to which the corporation (through its department of docks) has devoted the waters in question for *sanitory purposes for the benefit of the public*, by the license granted to the plaintiffs.

IV. The act in question (granting power to the harbor-masters) must be strictly construed, so far as its letter would purport to interfere with the *private vested rights*, or the *sovereign authority*, or the previously granted or habitually exercised *police power* of the city in respect to its "*wharf property*" and *franchises;* or to oust it of its power to *exclusive control* in the premises, under its charter and the acts of the legislature.

The *constitution of the state* protects the city against such interference as respects its *vested rights* and authority (*Benson* agt. *The Mayor, &c.*, 10 *Barb. R.*, 323; *Roosevelt* agt. *Godard*, 52 *Barb. R.*, 550).

V. The acts creating the office and prescribing the powers and duties of "*dock commissioners*," and clothing the common council with *police power* (*Acts of* 1870, 1871 *and* 1872, *supra*), plainly show that the legislature had not intended (*by the act of* 1862, *supra*) to interfere with the rights and powers of the corporation to control the "*wharf property*" belonging to the city in such matters as are involved *in*

*the special use* of the waters in question granted to the plaintiffs.

VI. The defendants do not represent the *public*, and are mere creatures of the statute.

Fifth. It is an old and well established rule in equity to grant an injunction to restrain a threatened injury like the present, involving, as it would, *irreparable injury and damages incapable of computation or compensation* by a legal action for damages. This injunction should therefore be granted *pendente lite* until the conflicting claims of authority can be definitely settled by the trial of the issues involved (2 *Story Eq. Jurisp.* ,§§ 928, 929).

I. No harm can result to the defendants from granting the injunction, while its refusal subjects the plaintiffs to great and irreparable loss at the *season* most critical to the plaintiffs, and when the public interests served by them are chiefly involved.

HORACE M. HASTINGS, *for defendants*, relied chiefly on the statute giving power to the harbor commissioners, and citing the cases of *Adams* agt. *Farmer* (1 *E. D. Smith*, 589) and *Franklin* agt. *Pendleton* (3 *Seld.*, 508), to show that this bath-house was a "ship or vessel."

MONELL, *J.*—The space occupied by the plaintiffs for their bathing-house, under a "permit" or license from the commissioners of the department of docks, is a part of the navigable waters of the East river. It lies below the low water mark, and partly in the channel of the stream, and is used wholly for private emolument.

Such a use of a public navigable river would be a purpresture, or public nuisance, unless authorized by law. The ninety-ninth section of the act to reorganize the local government of the city of New York, as amended in 1871, declares that the department of docks shall· have exclusive charge and control * * of all the wharf property belonging to the city, including all the wharves, piers, bulk-heads and struc-

tures thereon, and waters adjacent thereto, and all the slips, basins, docks, water fronts, land under water, and the appurtenances, easements, uses, reversions and rights belonging thereto, which are now owned or possessed by the corporation. Such department also has the exclusive charge and control of the repairing, maintaining, leasing and protecting the property; and is invested with the exclusive government and regulation of all wharves, piers, bulk-heads and structures thereon, and waters adjacent thereto, and all the basins, slips and docks, with the land under water, in said city not owned by the corporation.

Under this most comprehensive and clearly defined authority in the dock commissioners over the dock property of the city, which extends, as will be seen, over the slips, basins, and adjacent waters, and includes as well property owned and not owned by the city, the power of the commissioners to grant leases and franchises, and to permit private uses of such slips, basins and adjacent waters, where such use does not essentially interfere with or obstruct the public use, cannot well be questioned.

All navigable streams belong to the public; and the state cannot grant them to any private use that will impair the public use. Congress, under its authority to regulate commerce, may, in furtherance of commerce, restrict, in some degree, the public use of navigable waters (*State of Penn.* agt. *Wheeling, &c., Bridge Co.*, 18 *How.*, 421); but no such authority is reserved to the states (*Gilman* agt. *Philadelphia*, 3 *Wall.*, 713). A grant of a monopoly of the Hudson river, given to Robert R. Livingston in 1798, was declared by the supreme court of the United States to have been unconstitutional, as infringing the exclusive power of congress to regulate commerce (*Gibbons* agt. *Ogden*, 9 *Wheat.*, 1).

The authority of that case has since been uniformly recognized and followed; and grants by the state have been confined to such uses only as do not impede the public use. Hence, in grants for the erection of bridges or other struc-

tures over or in navigable streams or waters, provision must be made for their construction in such manner as not essentially to obstruct the common free navigation by the public (*People* agt. *Saratoga and Rens. R. R. Co.*, 15 *Wend.*, 113 ; *Penn.* agt. *Wheeling, &c., Bridge Co.*, 13 *How.*, 518 ; *Columbus, Mo., Co.* agt. *Peoria Bridge Co.*, 6 *McLean*, 70).

The act of the legislature creating the department of docks is valid, if no grant is made under it which will obstruct commerce. The commissioners may regulate the use of the basins and slips, and may permit them to be used for private purposes, provided such use does not essentially impair the public use. There are no riparian rights to adjacent waters, and the public can complain only when its use is obstructed.

In *Lansing* agt. *Smith* (4 *Wend.*, 1), involving the Albany pier question, the chancellor says (*p.* 21) : "there can be no doubt of the right of the legislature to make grants when they do not interfere with the vested rights of individuals. The right to navigate public waters are public rights, and not the private, inalienable rights of each individual."

But should the department grant the exclusive private use of slips or basins to a degree that would essentially interfere with the rights of the public, it would be a purpresture, and indictable as a public nuisance (*People* agt. *Vanderbilt*, 26 *N. Y. R.*, 287 ; 28 *id.*, 396).

But, within the restrictions mentioned, the department, under the power to regulate the use of the slips and basins, may lawfully permit their use for a private purpose. In one case (*Hecker* agt. *Balance Dock*, 24 *Barb. R.*, 315) the court even held that the corporation might direct the use of any particular slip to be appropriated exclusively to any particular craft or class of vessels.

Without, however, concurring in this perhaps extreme view, it is sufficient if the appropriation to a private use does not essentially interfere with the use for commerce.

The test, therefore, of a legislative grant of power over navigable waters is whether it allows of any essential inter-

ference with the public use; and that is always a question of fact, to be disposed of in the manner such questions are usually determined. If there is no such interference or obstruction of the public use, then a legislative grant of a private use is neither a purpresture nor a public nuisance.

Independently of this general principle, applicable to all navigable streams, the right and authority of the corporation to and over the wharves, piers, slips and basins, granted first by the ancient charters (*Montgomerie*, § 38), and since recognized and continued in all subsequent legislation, extend the jurisdiction of the city over much of the adjacent waters, which, at the present day, reach at least to the pier or bulk-head line (*People* agt. *Vanderbilt*, 26 *N. Y. R.*, 287).

It has not, I think, been doubted at any time that, within the space thus granted, the corporation has the most ample power to occupy and use it; and, as an incident or appurtenant, to grant to others the right to occupy and use it to any extent that does not at least obstruct the free navigation of the river. The construction of piers, slips and basins is as essential to commerce as the water itself; and that which is so essential to commerce can hardly be said to obstruct it.

The proofs presented upon this motion fail to satisfy me that the small space occupied by the plaintiffs' bath-house can cause any material interference with or obstruction of the free and common use of the river by the public. Of course, while such space is so, occupied it cannot be used by others, and so far it may be said to obstruct the public use. But so it may be said of a bridge with its draw closed. If, however, it is provided with a sufficient draw, it is a lawful structure, notwithstanding it may, at times, and to some extent, interrupt the public use of the stream (*Renwick* agt. *Moore*, 3 *Hill*, 621).

Nevertheless, such use of the slip would constitute it a public nuisance if it were not sanctioned by the commissioners' license. No person, without a grant, can permanently moor a floating structure in a public river. It would, *per se,*

be a public nuisance (*Hart* agt. *Mayor, &c., of Albany,* 9 *Wend.,* 571). But assuming, as I must, that the grant or license to the plaintiffs is of a portion of the water not needed for navigation or commerce (except, perhaps, in exceptional cases), or, in other words, a grant that does not and will not essentially interrupt or obstruct the free and common navigation of the river, it must follow that the plaintiffs are lawfully in possession of the space they occupy, and cannot be dispossessed or disturbed in such possession, unless the grant or license from the dock commissioners is subject to a higher power lodged in the captain of the port and harbor-masters.

That question I will now examine. The powers of the last named officers are derived from acts of the legislature, passed in 1862 and 1867.

The act of 1862 provides, in section 7: "Each harbor-master shall have power, within the district assigned to him, to provide and assign suitable accommodations for all ships and vessels, and regulate them in the stations they are to occupy at the wharves or in the stream, and to remove from time to time such vessels as are not employed in receiving or discharging their cargoes, to make room for such others as require to be more immediately accommodated for the purpose of receiving or discharging their cargoes."

The distinctive duty of the captain of the port is of a supervisory nature. He may make rules and regulations, and give directions in aid and for the governance of harbor-masters; but the power of all such officers is derived chiefly, if not wholly, from the act of 1862.

Under that act it is claimed not only that the harbor-masters have the exclusive control over the slips and basins, and other navigable parts of the river, but that they are the ultimate arbiters of the manner in and purpose for which they may be used.

If a power so comprehensive could be claimed for the harbor-masters there would be a manifest inconsistency in

the provisions in the statutes; and, as the city claims under the last statute (*act of* 1871), it would lead to the conclusion that the legislature intended to repeal the former. The saving clause, however, is found in the act of 1871, namely, that the powers and duties therein conferred upon the dock commissioners shall not affect the powers of the harbor-masters as now defined by law.

The powers and duties of these several officials are wholly distinct and separate. Those of the dock commissioners I have already defined.

The duties of the harbor-masters are of a conservative nature, and are only, but indispensably, necessary whenever an extensive commerce is carried on. Without some power of control over the arrival and departure of vessels and their moorage when in port, disorder and confusion would be the consequence. To regulate this, and to prevent disorder, these officials are clothed by the legislature with a constabulary or police power, and made *quasi* conservators of the peace.

They are, however, officers of limited jurisdiction, and can exercise such powers only as are expressly given, or which can necessarily be implied from such as are expressly given. Such express powers, as defined by the statutes, are to provide and assign suitable accommodations for ships and vessels, and to remove such as are not employed in receiving or discharging cargo, and to make room for such others as require to be more immediately accommodated for the purpose of receiving or discharging cargo. The object of all this is to prevent over crowding, confusion and disorder, and to secure just and equal right in the use of the harbor.

To this extent the harbor-masters have jurisdiction. They may regulate the time and manner that ships and vessels shall occupy slips and basins for purposes of commerce, and determine between the conflicting claims of vessels, and as to their respective rights and priorities to discharge or receive their cargoes.

These duties do not at all conflict with the powers of the dock commissioners, and the two can move along in entire harmony.

The harbor-masters have a large discretion in assigning the use of the slips to vessels, and in determining the time and manner of using. But it is not an absolute or arbitrary power, which may be exerted without regard to the exigencies of the time and place. Like all discretionary powers, it must have a foundation of propriety or necessity to rest upon.

While they may lawfully prevent disorder and confusion, and, in the language of the act, remove such vessels as are not employed in receiving or discharging cargo, I cannot concede to them the right to make such removal, except for the purpose, also specified in the act, of making room for such others as require to be more immediately accommodated for the purpose of receiving or discharging their cargoes.

In the case of *Adams* agt. *Farmer* (1 *E. D. Smith*, 588) the common pleas held that, as the power was general, it was not limited to cases where other vessels required to be immediately accommodated in receiving or discharging cargo. But that decision cannot be reconciled with other decisions defining the extent of discretionary powers.

In *Vanderbilt* agt. *Adams* (7 *Cow.*, 349), the harbor-master had ordered the *Thistle*, lying at a wharf on the North river, to move a certain distance in order to give a berth to another vessel called the *Legislator*. The court say: " It will be observed that no question is raised as to the right of the steamboat *Legislator* to lie at this wharf had there been no other vessel occupying it. The ground of the defense is, that the law conferred no authority to interfere at all; the owner of the *Thistle* having the exclusive right of deciding whether to remove or not, in order to give place to another vessel. The right assumed by the harbor-masters under the law would not be upheld if exerted beyond what may be considered a necessary police regulation."

The board of health is supposed to be invested with large

Hoeft agt. Seaman.

discretionary powers; and by statute was required to cause all putrid or unsound meat, dead animals, etc., found in any street or other place, to be forthwith removed beyond the limits of the city. Under that statute this court held, in an action against an inspector for removing dead hogs (*Under-wood* agt. *Green*, 3 *Robt.*, 86), that the discretion, and therefore the judgment, of the official was absolute, and he was not responsible for any error of judgment. But the court of appeals, reversing this court (42 *N. Y. R.*, 140), held otherwise. That while it was conceded that the officer in the discharge of his duties is clothed with a judicial discretion, yet he is an officer of a limited and special jurisdiction, and when in any given case his power is challenged, he must prove some facts invoking or tending to invoke the exercise of his discretion.

The general railroad act was supposed to confide absolutely to the directors the right to determine what lands were required for the purposes of the road. But in *Rensselaer & Saratoga R. R. Co.* agt. *Davis* (43 *N. Y. R.*, 137), the court held that the determination of the directors was not conclusive; and that the court is to decide, upon the application, the question as to the necessity and extent of the appropriation.

The proposition to be deduced from these cases is, that when a power of any kind is to be exercised it must, have to uphold and justify its exercise, the support of sufficient facts.

Under this view of the case, before the harbor-master can direct the removal of a ship or vessel there must appear to be some necessity for it. It is not enough, in the language of one of the defendants, that he knows of no other place for the landing of certain merchandise. It must be shown that the place is, not may be, needed for some purpose connected with navigation or commerce. And until such necessity arises the officer is powerless to lawfully interfere.

In intrenching, as it may with some plausibility be claimed, upon the vested rights of the city, the legislature must be

~mderstood to have intended nothing more than is clearly expressed by the statute; and, therefore, to have merely invested the harbor-masters with certain prescribed police powers and duties in no way interfering with the proprietorship of the city. If it is successfully claimed to be otherwise, then the act would be open to the constitutional objection of taking vested rights without compensation.

But without pursuing the subject further, I am of opinion that if the space occupied ·by the bath-house is not needed for commerce, and the occupancy of it does not essentially interfere with the free and common use of the river for navigation, the permission to use it was within the power of the state to grant. That such grant was made to the department of docks, and its written permission to the plaintiffs gave them a lawful possession, of which they can be deprived only by its being established either that it is an essential interference with navigation, or that a necessity exists for its immediate use for the purposes of commerce.

The facts upon which this case, under the view which I have taken, must turn, namely, whether there is such an interference or obstruction of navigation as would render the grant void, or whether some immediate requirement or necessity of commerce exists to justify the interference of the harbor-masters, are questions of fact, and must be determined before the appropriate judgment can be pronounced.

It results from these views that the plaintiffs are in lawful possession, and cannot be disturbed until it appears that the space they occupy obstructs the public use or is needed for purposes of commerce.

As the case now stands I am justified in retaining the injunction until the trial.