## LOUISVILLE TRUST CO. v. CINCINNATI INCLINED PLANE RY. CO. (CITY OF CINCINNATI, Intervener).

(Circuit Court, S. D. Ohio, W. D.  January 4, 1897.)

1. STREET RAILROADS — UNAUTHORIZED USE OF STREETS — RECEIVERS — REMOVAL OF TRACKS.

The I. P. Co. operated a street railway in several streets in the city of C. The city brought suit against it, in a state court, to enjoin the operation of the railway in certain streets, and obtained a decree enjoining such operation, on the ground that the I. P. Co. had no legal right in such streets; the operation of such decree being, however, stayed for six months. This decree was affirmed on appeal. Before anything was done under it, the L. Trust Co., trustee of a second mortgage on the I. P. Co.'s property, filed a bill in the United States circuit court against the city, alleging that it was about to oust the I. P. Co. from certain streets necessary to the operation of the mortgaged road, and seeking to enjoin it from doing so. Pending this suit the L. Trust Co. also commenced a suit against the I. P. Co. for the foreclosure of the mortgage, in which suit a receiver was appointed, who took possession of the road and operated it. In the L. Trust Co.'s suit against the city, the circuit court reached the same decision as the state court as to the rights of the I. P. Co. in the streets, and it dismissed the bill. The decision of the circuit court as to the rights of the I. P. Co. was affirmed by the circuit court of appeals. The city then filed an intervening petition in the foreclosure suit, asking that the receiver be directed to cease operating the road in the streets in which the I. P. Co. had no legal right, and to restore full possession of such streets to the city. To this petition the L. Trust Co. filed an answer, averring that the I. P. Co. had applied to the proper authorities of the city for a renewal of its right to operate its road in the streets in question, which application was pending, and that it had also obtained from the state court a further stay of that court's injunction, for six months, to enable it to arrange with the city for a renewal of its right. *Held,* that an order directing the receiver to restore possession of the streets to the city, which would amount to a mandatory injunction requiring him to remove the railroad structure from the streets, involving great injury to the I. P. Co. and the mortgagee, would not be granted.

2. SAME—RIGHTS OF CITY.

*Held,* further, that the circuit court should not, by holding possession, through its receiver, of the lines of railroad which both state and federal courts had decided the I. P. Co. had no right to maintain, prevent the city from taking any means which it might have a right to employ to get possession of the streets, by proceedings to abate a nuisance or otherwise, notwithstanding the operation of its injunction had been stayed by the state court, and its right to resort to any other proceedings might be doubtful.

3. SAME—RIGHT OF CONDEMNATION.

*Held,* further, that a possible right of the I. P. Co. to condemn the right of way in the streets in question afforded no reason for continuing the possession of the receiver until such proceedings could be taken; the right not being clear, and the right of way to be condemned not being a mere link, but the major portion of the whole line.

4. SAME—RECEIVER'S POSSESSION.

*Held,* further, that, as the same department of the city government to which the I. P. Co.'s application for a renewal of its right had been submitted must decide whether proceedings should be instituted to remove the railroad from the streets, the court might properly continue the receiver in possession until that department notified him that it desired to take possession of the streets, but that upon such notice the receiver should surrender to the I. P. Co. the possession of the railroad in the streets in question.

This is an intervening petition by the city of Cincinnati praying the court to direct its receiver to deliver over to the city, for occupation

by the Cincinnati Street Railway Company, portions of the route in the streets of Cincinnati occupied by the tracks of the Cincinnati Inclined Plane Railway Company, now in possession of the receiver of this court appointed in the above-entitled cause, and which are being used by him in the operation of the railway of the said inclined plane railway company. In order that the questions which are presented by these intervening petitions should be fully understood, it is necessary to state in a summary way the history of the litigation between the inclined plane railway company and the city, and between the Louisville Trust Company, the second mortgagee of the inclined plane railway company, and the city of Cincinnati:

The Cincinnati Inclined Plane Railway Company was organized in April, 1871, under the provisions of the general corporation act of Ohio of May, 1852, providing for the incorporation of steam railway companies for the purpose of constructing a railroad, the termini of which were to be in the city of Cincinnati and village of Avondale, Hamilton county, Ohio. In 1889 the Avondale terminus was duly extended to Glendale, in the same county. Under the act of 1852, and one of 1877, and certain grants by the city council, some directly from the city to the inclined plane company, and one derived by mesne assignments from other grantees of the city, the inclined plane company has maintained to the present day an inclined plane reaching from the head of Main street, at its intersection with Mulberry street, as its base, to Locust street, on Mt. Auburn, as its top, and has maintained a street railway from the bottom of the incline down Main street to Court, west on Court to Walnut, south on Walnut to Fifth, east on Fifth to Main, north on Main to the foot of the inclined plane, and from the top of the inclined plane north on Locust street to Mason, east on Mason to Auburn avenue to Vine street, north on Vine street to the Zoölogical Garden, and thence beyond the city limits to Carthage; returning from the Zoölogical Garden on Vine street to Auburn avenue, south on Auburn avenue to Mason, west on Mason to Locust, south on Locust to the top of the inclined plane. On December 12, 1890, the city of Cincinnati filed an action in the superior court of that city against the Cincinnati Inclined Plane Railway Company to recover car licenses and percentage of gross earnings, and to enjoin the railway company from maintaining and operating its cars upon more than one track on Auburn street from Mason to Vine streets, and from maintaining its tracks or operating its cars upon any of its tracks on Main, Court, Walnut, or Fifth streets. The cause was heard by reservation in the general term of the superior court, and on October 12, 1893, a judgment was entered which, among other things, found that the company was illegally and without right maintaining its tracks, poles, wires, and other appliances in Main street, Court street, Walnut street, and Fifth street, and that it had no legal right to maintain and operate a railway on more than one track on Auburn avenue from Mason to Vine streets. In accordance with the finding, the court enjoined perpetually the inclined plane company from continuing to maintain and operate a street railway over those portions occupied by it without right. The order of injunction contained the following limitation: "It is further ordered that the operation of this decree be, and the same is hereby, stayed for the period of six months, with liberty on the part of the defendant to apply for an extension of time. To which order staying the operation of this decree the plaintiff excepts." The case was taken to the supreme court of Ohio, and affirmed October 30, 1894. 44 N. E. 327. Nothing had been done under the decree when, on the 6th day of March, 1895, a bill of complaint was filed by the Louisville Trust Company, in this court, against the city of Cincinnati, averring that it was the trustee under a mortgage made by the Cincinnati Inclined Plane Railway Company January 1, 1889, conveying to it all the property of said inclined plane railway company to secure bonds to the amount of $500,000 issued by that company, $375,000 of which had been issued, and had gone into the hands of bona fide purchasers; that this mortgage was subject to the priority of a first mortgage on the same property issued to secure bonds amounting to $125,000, made to William A. Goodman, trustee. The bill averred that the city of Cincinnati was proposing to oust the company from possession of certain streets necessary to the operation of the road mortgaged, and

to install therein another railway company, without right, and in violation of the lawful interests acquired by said complainant trustee through said mortgage in and to the property of the street railway company. Pending the submission of the cause made by the bill of the Louisville Trust Company against the city of Cincinnati, the same complainant filed the bill in this cause against the Cincinnati Inclined Plane Railway Company, averring that the interest on the bonds secured by the mortgage to it had not been paid, that the railway company was insolvent, and praying a foreclosure of the mortgage, and that all the property of the company covered by the mortgage might be sold, subject to the first mortgage, to pay complainant's debt. The bill prayed for the appointment of a receiver to take charge of the company's property, to operate the road, and to turn the net earnings into court for distribution in accordance with the terms of its mortgage. The prayer was granted, and on the ———— day of October, 1895, Brent Arnold was appointed receiver of the road, and directed to take possession of all its property, and to operate the same under the orders of the court. Subsequent to this appointment, this court decided, in the action brought by the Louisville Trust Company against the city of Cincinnati, already referred to, that the equities of the case were with the city, and dismissed the bill, on April 7, 1896. 73 Fed. 716. From this decree the Louisville Trust Company took an appeal to the circuit court of appeals, and pending the appeal in the suit against the city the receiver continued to operate the entire line of the inclined plane railway company. The conclusion of the circuit court was in accordance with the decision of the state court. Upon the issues made in that court, it held, moreover, that the right of the Cincinnati Inclined Plane Railway Company to operate its inclined plane over Miami, Dorsey, and Baltimore streets had expired. The circuit court of appeals for this circuit decided that, under the circumstances of the case, it was not bound by the decision of the state court, and that it must exercise an independent judgment thereon. Proceeding to do so, the court found that the right of the inclined plane company to occupy Main street from Liberty south to Court, over Court west to Walnut, down Walnut, south to Fifth, east on Fifth to Main, and north on Main to Liberty, had expired, and that its present occupation of those streets was in violation of the rights of the city. It further held that the inclined plane was operated over Miami, Dorsey, and Baltimore streets without any legal authority from the city, or any right therefor. It further held that the inclined plane company was entitled to occupy only one track on Auburn avenue from Mason street to Vine street. It held, however, that, under the acts of the legislature and the grants from the city, it still had a right to occupy Main street from Liberty to the foot of the inclined plane, where Main street intersects with Mulberry, differing in this respect from the state courts. 22 C. C. A. 334, 76 Fed. 296. The decision of the court of appeals was that the complainant below was entitled to an injunction against the city from undertaking to dispossess the mortgagor from that part of its line occupied under valid and unexpired grants, as laid down in the opinion. and that the complainant below might have leave to file an amended and supplemental bill setting up the pendency of the foreclosure suit, the action therein in the appointment of the receiver with leave to bring in the city of Cincinnati as a party claiming rights in the mortgaged property, and for such other orders and decrees as were not inconsistent with the views expressed in the opinion. A mandate has come down from the circuit court of appeals, and an entry has been made in accordance with the opinion of the court of appeals, setting aside the decree dismissing the bill, and giving complainant leave to amend his bill of complaint as he may be advised.

On the 8th of December, 1896, the city of Cincinnati filed an intervening petition in this cause, in which it sets out substantially all the facts heretofore reviewed, and avers that it has, by its board of administration, in accordance with law. extended route No. 5, route No. 9, and route No. 18, now owned and operated by the Cincinnati Street Railway Company, in such a manner as to require the laying of tracks by that company on a large part of the streets in which the tracks of the inclined plane company are now being operated by the receiver of this court, though, by the decisions of the supreme court of Ohio and of the circuit court of appeals of the circuit, the grants for the same to the inclined plane company have expired; that such extensions have been accepted by the Cincinnati Street Railway Company; and that it has partially laid its track in the streets upon which the extension is granted, other than the streets occupied by the

receiver. The petition further avers that, for the purpose of carrying out the contracts of extension between the city and the Cincinnati Street Railway Company, "it is necessary that the possession of the said streets for the maintenance and operation of the street railway should no longer be held and maintained by the receiver herein, and the petitioner therefore says that by reason of said interest, as well as by reason of the fact that the receiver is occupying and using said streets unlawfully, without any warrant of law, this petitioner is entitled to have the tracks in such streets, and the poles and wires therein, placed by the Cincinnati Inclined Plane Railway Company, and now used and maintained by the receiver, removed therefrom, and full control of said streets surrendered and restored to the city of Cincinnati. This petitioner therefore moves and prays the court that an order be made herein directing the receiver to cease from holding possession of the streets,—of Main street from Liberty to Fifth, Court street, Walnut street, Fifth street, and that part of Auburn avenue from Mason to Vine street now occupied by the track of the Cincinnati Inclined Plane Railway Company, laid therein as a part of said route No. 8,—and from using said streets, or any part thereof, and from maintaining or operating thereon said railway, and from maintaining their poles and electric wires, and that the said receiver be made to restore full possession of said streets to the city of Cincinnati, and, further, that an order be made prohibiting the said receiver from crossing with the inclined plane structure, or with cars thereon, the said streets mentioned in the said resolution of June 16, 1871, to wit, Miami, Baltimore, Dorsey, and Locust streets between Dorsey and Saunders streets, and Mount street, and that the said receiver be directed to restore to the city of Cincinnati full possession of the said streets, and that, notwithstanding the said order entered by this court, appointing the receiver herein, the city of Cincinnati be permitted to resume full and entire possession and control of its said streets crossed or occupied by said inclined plane, and of its said streets included in said route No. 8, and to take such means to regain such possession and control, and to remove the poles, wires, and tracks in and on said streets, as it might lawfully take if said receiver had not been appointed by this court."

This cause came on upon the intervening petition of the city on Saturday December 12, 1896, and was partially heard. The court adjourned the hearing until December 19, 1896, to give the Louisville Trust Company an opportunity to file an answer. On that day the answer was filed. The answer, after referring to the suit in the superior court of Cincinnati, says: "That by instituting the said suit the city of Cincinnati, in regard to the occupancy of its streets by the inclined plane company, submitted itself to the jurisdiction of that court, and is bound to conduct itself with reference to the respective rights of the city and of the inclined plane company as the said court may from time to time order and decree. Complainant further states that it was advised by counsel learned in the law that it had the right to procure from the city of Cincinnati the renewal of its franchises on the streets embraced in route No. 8, and Locust street, so far as occupied by its inclined plane, and the right of crossing the other streets with its inclined plane, and it was further advised by such counsel that the proper authority of the city of Cincinnati, to whom such application should be made, was the board of legislation; that, being so advised, it did, on Monday, December 14, 1896, in good faith, make application to said board of legislation for a renewal of its grants and rights, and offered to submit itself to such fair and just terms of renewal as the city may be advised it should so submit itself; that said board of legislation received its said application, and caused the same to be referred to the joint committees on steam railroads and street railroads, and that the same is now pending in such board of legislation in this way; and that the said inclined plane company intends to prosecute its application with vigor and dispatch, and in good faith, and is determined to submit itself to such terms as said city may require of it. The complainant says that this was done under a resolution of the board of directors of the said inclined plane company on December 11, 1896, a copy of which is set out in the complainant's amended and supplemental bill of complaint, and which is now referred to. The complainant further states that on December 18, 1896, said inclined plane company caused an application to be made by its counsel, before the superior court of Cincinnati, in the case above referred to, for a suspension of the decree therein entered, enjoining it from the occupancy of the streets mentioned in the said decree, and that evidence was heard

upon its part, and upon the part of the city of Cincinnati, in the said application, on that day, and that on December 19, 1896, the said court entered a decree suspending said injunction for six months, with leave to further apply. ' A copy of the decree of said court entered upon said application, and of the opinion of the judge granting the same, is now referred to, and is made a part hereof. The complainant further states that it is advised by counsel that such application as to the city of Cincinnati was properly made, and is further advised by counsel that its making the same has been approved by the court holding the matter in consideration, as between the city of Cincinnati and the said inclined plane company. The complainant further states that it is advised that if the receiver was to be discharged herein, or directed to cease operation of the said lines, that it is the purpose of the Cincinnati Street Railway Company, directly or indirectly, to forthwith cause the tracks of the inclined plane company to be torn up along all that part of route No. 8 which is coincident with any of the grants of the intervening petition as having been made to the Cincinnati Street Railway Company, with a view to so crippling the inclined plane company as to render it financially unable to comply with such terms and conditions as the city may hereafter exact; and the complainant is advised that, under the laws and ordinances governing the city of Cincinnati, that the Cincinnati Street Railway Company cannot lawfully build upon any of the streets of said city any new lines of railway between November 1st and March 31st, the breaking and opening of the streets for the construction of street railroad, between these dates, being prohibited by law, and so it will be that the railroad in the hands of the receiver cannot be operated, nor can there be any railroad laid down, within that time, and the public will suffer great loss, inconvenience, and damage. The complainant, therefore, in view of the decree of the said superior court of Cincinnati, and in view of the facts and circumstances in this case, says that it would be inequitable and unjust to comply with the prayer of the intervening petition of the city of Cincinnati herein; that there has been expended in building, maintenance, and operation of said inclined plane and adjoining properties a large sum of money, to wit, $750,000, most of which would be lost if the said order prayed for by the city of Cincinnati should be granted by this court. ❋ ❋ ❋"

Prior to the filing of this answer, on December 12, 1896, the Louisville Trust Company tendered its supplemental and amended bill of complaint in its action against the city. In this it avers "that a single track line of railway upon Auburn avenue, between Mason and Vine streets, cannot be successfully or conveniently operated without good and sufficient switches or turnouts for the passage of cars, and that, in case the said city of Cincinnati shall not agree with the said receiver in regard thereto, then the court herein should ascertain and adjudge what switches and single tracks should be maintained and operated upon the said street." The bill then further proceeds to ask that the receiver shall, for and in behalf of the defendant, the Cincinnati Inclined Plane Company, for the benefit of all persons concerned, be authorized and directed to appropriate so much of said streets and alleys as may be necessary for the use and operation of said inclined plane, of the streets over and along which the cars of the said receiver are now being operated, in accordance with the laws of Ohio for condemnation by a steam railway company of the streets and alleys of a municipal corporation necessary for its maintenance, under section 3283 of the Revised Statutes of Ohio.

Evidence was introduced in support of the averments of the city's intervening petition, and of the answer of the Louisville Trust Company. It was shown that the board of administration had directed the corporation counsel to proceed with this intervening petition, and to procure the removal of the tracks of the inclined plane company from those streets in which it had been adjudicated to have no rights, and that the receiver should be requested to discontinue the inclined plane railway over such streets, and that a copy of such request had been served upon the receiver.

E. A. Ferguson, St. John Boyle, and Alex. P. Humphrey, for Louisville T. Co.

Thornton M. Hinkle, for Cincinnati Inclined Plane Ry. Co.

Fred Hertenstein and J. D. Brannon, for city of Cincinnati.

Miller Outcalt, for W. A. Goodman.

TAFT, Circuit Judge (after stating the facts). The city asks the court to direct its receiver to surrender to it possession of certain streets in which he is now operating a railway. This would require him to remove the tracks, poles, and wires of the company from those streets, and also to tear down and remove the bridges of the inclined plane over Miami, Dorsey, and Baltimore streets, as well as those parts of the inclined plane trestle and engine house which lie in Locust street. Such an order would be, in effect, a mandatory injunction against the inclined plane company and the complainant, the Louisville Trust Company. The court always exercises a sound legal discretion in the granting of even a prohibitory injunction, and often declines to make the order, or delays its operation, in view of the balance of conveniency and hardship between the parties. A fortiori is this true in the granting of a mandatory injunction. Such an order in this case would work great injury to the interests of the inclined plane company and the trust company. Negotiations have been opened by the inclined plane company with the board of legislation of the city, looking to the renewal of former grants. The superior court, which in 1893 granted a perpetual injunction against the use by the inclined plane company of the invalid part of its line as a street railway, has suspended the operation of its injunction for six months from December 11, 1896, to permit such a negotiation. The vigor of Judge Smith's language in granting the suspension leaves no room to doubt that in his judgment the situation of the parties justifies him in withholding his hand, as chancellor, in the enforcement of the decree, until a full opportunity is given to the inclined plane company to obtain, if possible, new concessions from the city. I concur with Judge Smith in this view, and do not think that the time allowed is unreasonable, when one considers the somewhat slow movements of a municipal legislature. It is urged upon the court that such an affirmative order of the kind here prayed for was made upon a receiver in the case of Felton v. Ackerman, 22 U. S. App. 154, 9 C. C. A. 457, and 61 Fed. 225. The circumstances of that case were very different. There the receiver, while operating a railroad, erected a fence across a public highway, under a void order of a road commissioner. He was required by the court to undo the wrong he had unwittingly done. It was no sacrifice of the property in his charge. The fence reduced the number of railway crossings by one, and to that extent lessened the danger of crossing accidents; but its removal caused but a slight change in the receiver's situation, or that of the railway company's line which he was operating. So far as the petition of the city asks for affirmative relief against the inclined plane company and the trust company in the form of an order for the removal of tracks, poles, wires, bridges, and buildings, it is denied.

But this conclusion by no means disposes of the whole case made by the city's petition. The court is in possession, by its receiver, of the whole line, valid and invalid. The city can pursue no remedy for the enforcement of its rights in the line except by application to this court. Therefore this court has ancillary jurisdiction to entertain the petition, although the city and the inclined plane company are both citi-

zens of Ohio.   Compton v. Jesup, 31 U. S. App. 486–524, 15 C. C. A. 397, and 68 Fed. 263.   When a court thus takes possession of property by its receiver, it necessarily assumes an obligation to every one interested in it, or affected by its use, either to afford by its own orders every remedy which such person might have to assert his rights had no receiver been appointed, or else to give him leave to pursue such remedy against the receiver as if the receiver were a private person.   Compton v. Jesup, 31 U. S. App. 486–534, 15 C. C. A. 397, and 68 Fed. 263 et seq.   Will this obligation be discharged by the court, if, after denying the city the affirmative relief it prays, it shall maintain the status quo, and continue to operate the railway line, valid and invalid, during the period fixed for negotiation by the superior court?   The order directing the receiver to operate the road is, in effect, an injunction against the city's interference with his use of the invalid portion of the line.   It constitutes affirmative and positive protection to the inclined plane company in its occupation of the streets.   But it is said that the operation by the receiver of the road does not deprive the city of any remedy to possess itself of the streets in controversy, because its sole remedy is by enforcement of the decree of the superior court, and that is suspended for six months, and so this court may properly remain in possession till the injunction of the superior court becomes effective again.   It is contended that the bringing of the suit by the city, in the superior court, against the inclined plane company, and the procurement of the injunction, constitute such an election of remedies by the city that it can pursue no other to obtain possession of the streets, and that the order suspending the operation of the injunction really enjoins the city from seeking possession of the streets while it is in force.   Again, it is urged that the inclined plane company, under the law of Ohio, has the right, if it cannot agree with the city as to terms upon which it shall have a new grant, to condemn the right to occupy the streets necessary to restore its former route. It is also contended, and cases are cited which are said to sustain the proposition, that equity would enjoin the city from ousting the inclined plane railway company by physical force from the use of streets, though it has been declared to be unlawful, and thus compel the city to confine its efforts to action in the courts.   It is further said that the city could not take any steps to remove the tracks and other property of the inclined plane company now, or until April 1st next, because of a general ordinance which forbids the tearing up of the streets to lay or remove railway tracks from November 1st until April 1st.

Coming now to consider the points thus made on behalf of the inclined plane company in this order, it may first be said that counsel have not been able to find and cite a case supporting the view that an order temporarily suspending the order of injunction in effect enjoins the complainant from obtaining his rights in any other lawful way pending the suspension.   To say the least of it, the claim is of doubtful validity.   See Bissell Carpet Sweeper Co. v. Goshen Sweeper Co., 19 C. C. A. 25, 72 Fed. 545, 560.

2. Nor do I think that the other proposition that the city may not

oust the inclined plane railway from the enjoyment of its admittedly illegal occupation of the streets, by using only so much force as is necessary, has been so clearly established as to admit of no doubt. The cases cited by the counsel for the trust company and the inclined plane company are Easton, S. E. & W. E. P. Ry. Co. v. City of Easton, 133 Pa. St. 505, 19 Atl. 486, and Asheville St. Ry. Co. v. City of Asheville, 109 N. C. 688, 14 S. E. 316. In the first of these cases a street-railway company had an admitted right to occupy a street with its tracks. In a change of grade made by the city, the company had to take up and relay its tracks for a short distance. The city claimed the right to require it to lay a particular kind of rail. The company laid another. The city tore it up, and stopped the operation of the road. The company relaid it, and then procured an injunction against the city's further interference. The supreme court of Pennsylvania held that an injunction would properly issue against the city, whatever the merits of the controversy over the different kinds of rails, because the city could not, before submitting the question to the courts, take the law into its own hands, decide a doubtful question of law, and, upon the assumption that its decision was right, inflict great loss upon the railway company's business, especially when the convenience of the public might be seriously affected thereby. The North Carolina case was similar in principle. In both cases the companies were rightfully in the streets, in neither case had the rights of the parties been adjudicated at all in a court, and in each the contention of the city authorities, out of which the action grew, was combated by the railway company. In the case at bar it has been decided finally, and it is not now denied by either the trust company or the inclined plane company, that the grants to the latter to occupy the streets in question have all expired. This would seem to make a broad distinction between the case at bar and those cited. By the common law, a tenant at will, who is notified by his landlord to leave the premises, may be forcibly ejected, without giving the tenant any cause of action, if no more force than is necessary to remove the tenant and his goods is used. Low v. Elwell, 121 Mass. 309. If a man build his house upon a common, a commoner may, after notice, tear down the house, though the man be in it, and this without incurring liability to the ejected person. Davies v. Williams, 16 Q. B. 546. More than this, it has been generally held that an injunction will not issue against threatened trespasses where the complainant cannot allege that he has good title to the property about to be entered upon. Hart v. Mayor, etc., 9 Wend. 571; Schoonover v. Bright, 24 W. Va. 698; Cox v. Douglass, 20 W. Va. 175; Tate v. Vance, 27 Grat. 571. Whether these cases, which nearly all concern the occupation of private property, would apply to the case at bar, may admit of question, but they certainly suggest forcible analogies to it.

3. With respect to the contention that the court ought to maintain its receiver in possession of the invalid portions of the line until an appropriation of the same by condemnation proceedings can be had, it is quite sufficient to say that the right of the inclined plane company to condemn is very doubtful. Again, the condemnation pro-

'ceedings would have to include about three-quarters of the route of the inclined plane company within the city. There are cases where a court has enjoined the owner of land taken as part of the right of way of a railway built and running, from ousting the company until the latter could institute condemnation proceedings, but they are where the right to condemn is undisputed, and where the land in question is so small a part of the railway line that the delay in payment for the land is an injury very slight, as compared with the loss entailed by cutting the road in two and stopping its business.

4. The effect of the ordinance of 1876, as to the tearing up of the streets in the winter season, would seem to have little bearing on this case, because, even if it has the full effect claimed for it, there is nothing in it to forbid the city authorities from stopping the operation of the cars of the inclined plane company, and nothing to prevent the taking down of the poles and wires. It admits of serious doubt, too, whether section 5 and section 7 of the general street railway ordinance of 1879 do not modify the scope of the ordinance of 1876.

As will be seen, I am not deciding definitely any of the issues of law raised by the counsel for the inclined plane company. I am only stating what appears to be sufficient to show that the claims made by them are at least of doubtful validity. This court does not decide that Judge Smith's order may not operate as an injunction, or that the city has the right to abate the wrongful occupation of the streets by the inclined plane company. All that is held is that, if the obstacle of the receivership is removed from the course of the city, it could urge reasonable arguments to sustain both propositions in defense of action taken by it on the faith of their validity. In such a case this court ought not, by the possession of its receiver, to prevent the city from taking such course with respect to a remedy as it may be advised. The whole risk of any course taken must be upon the city. If it does an act in contempt of the superior court, its agents must answer there. This court assumes no responsibility for any action the city may take, but it is the court's duty to remove the insuperable obstacle to the city's exercising a choice of remedies interposed by the receiver's possession of the invalid portion of the line.

In Lane v. Capsey [1891] 3 Ch. 411, which was a mortgage foreclosure, a receiver had been appointed to take possession of the property, including five houses. In a prior action against the mortgagor, brought to enjoin him from erecting any more houses on the right of way of the complainant, and to compel him to tear down parts of those erected, the complainant's right to a passageway was declared, and the injunction against further building was allowed, but the mandatory injunction was denied, without costs. After the receiver was appointed, the complainant applied to the court in the foreclosure proceeding for leave to abate the violation of his rights. It was contended that the refusal of the mandatory injunction forbade remedy by abatement, and so that no leave should be given. Mr. Justice Chitty said that, if it was clear that there could be no remedy by

abatement, it would be his duty to deny the leave, but that, if there was doubt about it, then he ought to remove the impediment caused by the receiver's possession to any lawful proceeding. He thought that the question of the right to an abatement was not necessarily foreclosed by the failure to obtain a mandatory injunction, and that it was sufficiently doubtful to require him to remove the impediment of the receiver's possession. He did this by giving the complainant the right to pursue any lawful remedy he might be advised against the receiver, without being in contempt, including forcible abatement, if lawful.

Under the circumstances of this case, I should not care to expose an officer of this court to a possible contest of force with the city authorities. Some other means must be devised for removing the obstacle of the receiver's possession to the pursuit by the city of any lawful remedy it may be found to have. By section 2640 of the Revised Statutes of Ohio, it is provided that the council shall have the care, supervision, and control of all public highways, streets, avenues, etc., within the corporation, and shall cause the same to be kept open and in repair, and free from nuisances. By subsequent legislation this power, in Cincinnati, is vested in a board of legislation. It is conceded by counsel for the city that before any proceedings could be taken by agents of the city for removal of the inclined plane company's tracks from the invalid portion of its line by way of abatement as a nuisance, the board of legislation must take action declaring the occupation to be a nuisance, and directing its abatement. This is the same board with whom negotiations are in progress for a renewal of the grants of the inclined plane company, and it may be inferred that, as long as there is any hope of an agreement between the board and the company, the former will not attempt to resort to radical measures by passing such a resolution. In view of the necessity for action by the board of legislation before any remedy by abatement can be tried, I think I may properly allow the receiver to continue the present operation of the lines until the board of legislation indicates its purpose to resort to abatement, by passing such a resolution as that indicated above. The question whether the public would or should be inconvenienced by practically destroying this line is one the responsibility of deciding which may justly be put upon this chief municipal body, and ought to be avoided, so far as possible, by this court. Counsel for the city have argued, from other statutes, that the court ought to hearken to a resolution of this kind from the board of administration, and act upon that; but the powers of that board relied upon relate to remedies by suit, and not to those by abatement of nuisances.

And now what must be the court's order if the board of legislation should pass a resolution declaring the receiver's operation of the invalid parts of the line a nuisance, and notify the receiver thereof? After that the court could not operate the invalid part of the line. The receiver was appointed to conserve the mortgage interests of the Louisville Trust Company. No suitor in equity can ask the court to do an unlawful act through its receiver. Scru-

pulous care in this regard is enjoined by statute upon federal courts in the operation of railroads by their receivers under state laws and franchises. In Felton v. Ackerman, 22 U. S. App. 154, 9 C. C. A. 457, and 61 Fed. 225, already referred to, the circuit court of appeals of this circuit said:

"It is of the greatest importance that receivers of the federal courts shall not be violators of the state laws; and wherever a court is made to know, in any proper way, that its receiver is violating the law of the state in which is the property of which he has charge, the court must, sua sponte, direct him to cease further violation."

This passage has been pressed upon the court as a reason why the court should immediately, without awaiting action by the board of legislation, order the receiver to cease the operation of the invalid part of the road, because it has been made to know that the company's grants have expired, and the city is trying, through the courts, to oust it from occupation of the streets. But I cannot regard the company as other than a tenant at will in the streets, until the board of legislation shall indicate its intention to treat the occupation as a nuisance. It is true that the city, by the corporation counsel, under direction of the board of administration, has filed petitions indicating its intention to procure the removal of the tracks, etc., from the streets; but pending the litigation, and the remedial process of the courts, it was understood tacitly that the company should continue the operation of the road as formerly. I think the court may assume such tenancy at will to exist, either until process issues from a court, or until the board charged with control of the streets shall indicate its purpose not to await judicial action. Had Judge Smith not suspended the order of injunction, I should have enjoined the receiver from operating the invalid portion of the line at once, because the board of administration having control of the litigation had notified the receiver of its desire to enforce its rights under the injunction. As it is, the attitude of the city is to be determined by the action or nonaction of the board of legislation. The case is a different one from a real obstruction of public travel, like that in the case of Felton v. Ackerman. Here the road is affording means of transportation to the public, and is not, in any practical sense, obstructing the streets; and until the city board charged with the duty of declaring nuisances and authorizing their abatement shall take formal action, and assume the responsibility of destroying this instrument of public convenience before judicial process shall issue, this court may treat the occupancy of the streets by the receiver as temporarily acquiesced in by the city, and not unlawful, in an indictable sense, pending negotiations for a renewal of the grants. When the board of legislation shall act, however, it is not a matter of doubt what the duty of the court will be. Its receiver must cease the operation of the invalid portion of the line. In considering the duty of the court in this case, the circuit court of appeals, speaking by Judge Lurton, said:

"If the occupation of any of the streets of Cincinnati is no longer lawful, the court should be quick in directing its receiver to respect the rights of the city, and to desist from the operation of such parts of the road as are upon streets

where the easement has expired, unless the consent of the city for such further operation is first obtained. The federal court must not suffer itself to be used as a means of obstructing the just and legal rights of the city, or less prompt in courteous regard for the judgment of the state court than the absolute necessities of the case demand, in order to prevent injustice to this complainant."

The language is mandatory upon this court, and I have certainly gone as far as it permits in leniency towards the inclined plane company, in treating the nonaction of the board of legislation as a tacit consent by the city to the company's temporary occupation of the streets. But suppose the board of legislation passes a resolution declaring the use of the streets by the inclined plane company unlawful; what course should the receiver take? He need not take up the tracks, and deliver possession of the streets to the city. To order that would be, as already said, a mandatory injunction, and a remedy the court is not inclined to grant. The only other course is to redeliver possession of the tracks and other property now in situ on the streets occupied without right to the inclined plane company. The receiver took possession for the benefit of the mortgagee. I assume that the mortgagee, with the alternative of a removal of the tracks, would prefer a restoration to its mortgagor of so much of the property mortgaged as is in place in the streets in which the grants have expired. But it will be practically impossible to run part of the line without the rest, especially when we consider that included in the property which the receiver must deliver to the company are the bridges over Miami, Dorsey, and Baltimore streets, and the engine house at the top of the inclined plane. Therefore the trust company would probably prefer that the entire property shall be restored to the inclined plane company, if the latter will consent to turn over to the receiver the net earnings from the operation of so much of the road as it shall be able to operate.

The order of the court upon the petition of the city will therefore be as follows: That from and after the receipt by the receiver of a notice from the board of legislation that his operation of the inclined plane railway in any of the streets in which by the decree of the circuit court of appeals the grants owned by said inclined company have expired, is unlawful and forbidden, the receiver is enjoined from operating the railway in such streets, and he is directed to surrender possession of the property of the inclined plane company in place in such streets to said inclined plane company; and it is further ordered that, upon written application filed herein by the Louisville Trust Company, the receiver shall deliver possession of all the remainder of the property of the inclined plane company now in his custody to said company, on the condition, consented and agreed to in writing, and filed herein by said company, that it will turn over to the receiver herein the monthly net earnings from the operation of its property, after payment of the running expenses thereof, including salaries, wages, and supplies. And the receiver is ordered, within two weeks hereof, to file a full and complete account of the receipts and disbursements for the entire period of his receivership. Each party will pay its own costs in this proceeding.

What has been said disposes of the pending questions. I only wish

to add, in order that my language may not be misunderstood, that I have not intended, in the slightest degree, to advise a resort by the city to violence to enforce its rights in the streets.    On the contrary, I think it would be deplorable if the city authorities, not accepting the weighty suggestion of the superior court in its order of suspension, and not abiding the expiration of that order, should foreclose reasonable negotiation, and disgrace the city's fair name by a course probably leading to a breach of the peace.    If the city disregards the suggestion contained in the superior court's order of suspension, it does so at its own risk, and cannot rely on any approval of such a course by this court.    All that this court decides is that, when the city demands the right to pursue remedies to enforce rights in the streets adjudged to belong to it by two courts of last resort, this court will not protect a party which is violationg those rights by throwing the shield of its receivership over such violation.    It will discharge the receiver, and let the inclined plane company, on the one hand, take the risk of operating the invalid portions of the road, if it chooses, and the city, on the other, that of any course it may see fit to pursue. The relation of this court to the controversy is merely incidental and ancillary, and imposes no duty upon it of distinctly deciding as to the lawful remedies of the parties, if it can free itself from that relation, as it can and will by the order above set out.